UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CA 05 006 L

NEU SOLUTIONS FACILITIES
SERVICES, LLC

V.

C.A. NO.
*Jury trial is demanded*

A.C. MOORE INCORPORATED;
JAMES MITCHELL;
BLUE CHIP SERVICES, LTD;
INFINITY CLEANING SERVICES, INC., AND
JOSEPH J. LOMBARDI

**VERIFIED COMPLAINT**

*Parties*

1. Plaintiff Neu Solutions, LLC ("Neu Solutions") is a Rhode Island Limited Liability Company; Richard J. Miguel is the owner and Managing Partner of Neu Solutions.

2. Defendant A.C. Moore Incorporated is a Delaware Corporation licensed and doing business in Rhode Island ("AC Moore").

3. James Mitchell is the Director of Store Planning for A.C. Moore.

4. Blue Chip Services, LTD. is a Delaware corporation ("Blue Chip").

5. Infinity Cleaning Services, Inc. on information and belief is either a Pennsylvania or New Jersey corporation ("Infinity").

6. Joseph J. Lombardi ("Lombardi") owns the stock of and is President or the controlling influence of Blue Chip Services, LTD; Lombardi also owns the stock of and is President or the controlling influence of Infinity.

*Jurisdiction and Venue*

7. This action is brought under Diversity of Citizenship pursuant to the United States Code, Title 28, Section 1332(a)(1) and 1332(b).

8. Venue is proper in Rhode Island. Neu Solutions is a Rhode Island Limited Liability Company. A.C. Moore is registered to do business in Rhode Island with a location at 300 Quaker Lane, Warwick and contracted with Neu Solutions. While Blue Chip is not a Rhode Island Corporation or registered to do business in Rhode Island, it preformed worked in Rhode Island for A.C. Moore and it contracted with Neu Solutions in Rhode Island. James Mitchell is Director of Store Planning at A.C. Moore who repeatedly interacted and negotiated with Neu Solutions, Blue Chip, Infinity, Joseph Lombardi and other current Neu Solution Sub contractors specifically regarding the issues herein. Joseph Lombardi is the owner and President of Blue Chip and Infinity who repeatedly interacted with A.C. Moore and Neu Solutions in Rhode Island. All specifically regarding the issues herein.

9. Neu Solutions seeks a Declaratory Judgment pursuant to 28 USC 2201 and Rule 57 Federal Rules Civil Procedure upon the actual controversy over the contracts between itself on the one hand and each of A.C. Moore and of Blue Chip on the other. Neu Solutions seeks a declaration of its rights and legal relations with each defendant arising from these contracts.

10. Neu Solutions seeks a Preliminary Injunction pursuant to Rule 65(a) Federal Rules Civil Procedure.

*Facts*

11. A.C. Moore is in the business of sale at retail of arts and crafts supplies from approximately 90 to 100 store locations in the northeast states of the United States.

12. Blue Chip is in the business of providing self performing cleaning services to commercial stores in multiple locations in the states of the northeast United States.

13. Infinity is in the business of providing self performing cleaning services to commercial stores in multiple locations in the states of the northeast United States.

14. Neu Solutions is in the business of providing contract managed and self performing cleaning services to commercial stores in multiple locations in the several states of the United States.

15. Prior to September 3, 2004, Blue Chip provided cleaning services to approximately two-thirds of A.C. Moore's locations.

16. On or about August 1, 2004, A.C. Moore induced Neu Solutions to enter a contract whereby Neu Solutions would provide cleaning services to 100% of A.C. Moore's locations including the all of the former Blue Chip locations. A Cleaning Agreement contract confirming this agreement commencing September 3, 2004, is attached as Exhibit 1 ("Cleaning Agreement").

17. As part of the Cleaning Agreement Neu Solutions was induced by A.C. Moore to purchase $232,550 of both new and used cleaning equipment, supplies and a new internet based tracking system specifically to perform the Cleaning Agreement.

18. Part of the $232,550 in equipment and supplies included a $61,000 Asset Purchase Agreement with Blue Chip. Neu Solutions entered this Asset Purchase Agreement verbally in August 2004 to be effective September 3, 2004. The Asset Purchase Agreement is formally dated October 1, 2004, and is attached as Exhibit 2.

19. As part of the Cleaning Agreement Neu Solutions expended the full $232,550 in reliance upon the Cleaning Agreement and the cleaning equipment and supplies are presently in place working at the various locations of A.C. Moore.

20. As part of the Cleaning Agreement Neu Solutions entered subcontractor agreements with many cleaning subcontractors in the various states where A.C. Moore is located. This includes a Subcontractor Agreement with Blue Chip attached as Exhibit 3.

21. The Blue Chip Subcontractor Agreement contains a one year non-competition clause and an equity enforcement clause at paragraphs 20(b) and (c) as follows:

b. "[Blue Chip] shall not, either directly or indirectly, in any individual, representative, or participatory capacity, whether as an owner, stockholder, member, partner, joint venture, employer, employee, director, agent or in any other capacity, (1) solicit, provide service to, or interfere in any way with any Customer account then being serviced by NEU (New Solutions) or which was a Customer account at any time during the term of this agreement," within one year of the termination of the Subcontractor Agreement.

c. [Blue Chip] does hereby acknowledge that money alone would not adequately compensate NEU for the damage to its business as a result of the breach by [Blue Chip] of its agreement of confidentiality and non-competition, and [Blue Chip] therefore agrees that in the event of any such breach, NEU, in addition to all other remedies available to it by law or in equity, will be entitled to injunctive relief for the enforcement thereof.

22. A.C. Moore and James Mitchell each knew of the existence of the Asset Purchase Agreement and the Subcontractor Agreement between Neu Solutions and Blue Chip.

23. Blue Chip, Infinity and Joseph Lombardi each knew of the Cleaning Agreement between A. C. Moore and Neu Solutions.

24. As part of the Cleaning Agreement Neu Solutions and A.C. Moore put into place a "Daily Service Quality/Payment Ticket" system to monitor and control on a daily basis the quality of service and payment for services provided by Neu Solutions to each A.C. Moore location.

25. In accordance with the Daily Service Quality/Payment Ticket system, Neu Solutions daily service provided to A.C. Moore was rated every day from on a three (3) point basis with three (3) the best and one (1) the worst.

26. Neu Solutions has an average Daily Service Quality rating of 2.38 or higher out of 3.0 for each month from October through December 2004 from all reporting A. C. Moore locations as follows: the summary of the Daily Service Quality Rating sheets is attached as Exhibit 4):

| Month (2004) | Total # Locations | # Reporting | % | Average Rating |
|---|---|---|---|---|
| October | 88 | 67 | 77% | 2.50 |
| November | 90 | 66 | 74% | 2.38 |
| December | 93 | 68 | 73.1 | 2.39 |
| January 4, 2005 | 93 | 86 | 93.4 | 2.37 |

27. On December 29, 2004, A.C. Moore by way of James Mitchell sent to Neu Solutions a "30 Day Notice of Cancellation of Corporate Cleaning Contract" stating the basis of the cancellation is Non-performance. The "30 Day Notice of cancellation" is Exhibit 5.

28. The assertion in the 30 Day Notice of Cancellation that the cancellation is based upon Non-performance is false and is merely a pretext for A.C. Moore to breach the Cleaning Agreement in order to replace Neu Solutions with Blue Chip and/or Infinity or another company operated by Joseph Lombardi.

29. In truth and fact Neu Solutions has fully fulfilled its contractual obligations to A. C. Moore set out in the Cleaning Agreement as objectively demonstrated by A.C. Moore itself, to wit: (1) the above average Daily Quality Ratings given by A.C. Moore employees in the field for three months; and (2) on December 30, 2004, AC Moore's Chief Engineer, Richard Kinkel extended Neu Solutions' cleaning contract to the A.C. Moore Distribution Warehouse Cleaning Agreement for one year to December 31, 2005. This extension is attached as Exhibit 5.

30. After the Notice of Cancellation, James Mitchell and A. C. Moore on or about January 5, 2005, advised Neu Solutions to remove all of Neu Solutions cleaning equipment and supplies from A.C. Moore's locations by the end of January 2005.

31. Neu Solutions has no alternative locations or use for the $232,550 in cleaning equipment and cleaning supplies it purchased and spread over several states in the Northeast United States at locations of A. C. Moore to perform the Cleaning Agreement.

32. Neu Solutions will incur thousands of dollars of costs to remove, relocate and store after the end of January 2005 the $232,550 in cleaning equipment and cleaning supplies it purchased and spread over several states in the Northeast United States at locations of A. C. Moore to perform the Cleaning Agreement.

33. On or about January 6, 2005, James Mitchell and A.C. Moore refused to purchase the said cleaning equipment and cleaning supplies from Neu Solutions at any price.

34. On or about January 6, 2005, Joseph Lombardi offered to buy the said cleaning equipment and supplies from Neu Solutions at an unconscionably low price.

35. James Mitchell, knowing of the Cleaning Agreement between Neu Solutions and A. C. Moore, engaged in a pattern of behavior since on or about September 2004 to present to improperly interfere with the Cleaning Agreement culminating in the 30 Day Notice of Cancellation

36. A.C. Moore, knowing of the Cleaning Agreement between Neu Solutions and A. C. Moore, engaged in a pattern of behavior since on or about September 2004 to present to improperly interfere with the Cleaning Agreement culminating in the 30 Day Notice of Cancellation.

37. Joseph Lombardi, knowing of the Cleaning Agreement between Neu Solutions and A. C. Moore, engaged in a pattern of behavior since on or about September 2004 to present to improperly interfere with the Cleaning Agreement culminating in the 30 Day Notice of Cancellation.

38. Blue Chip, knowing of the Cleaning Agreement between Neu Solutions and A. C. Moore, engaged in a pattern of behavior since on or about September 2004 to present to improperly interfere with the Cleaning Agreement culminating in the 30 Day Notice of Cancellation.

39. Infinity, knowing of the Cleaning Agreement between Neu Solutions and A. C. Moore, engaged in a pattern of behavior since on or about September 2004 to present to improperly interfere with the Cleaning Agreement culminating in the 30 Day Notice of Cancellation.

40. Neu Solutions will be damaged in the amount of $1,800,000 in lost revenue and incurred expenses if the 30 Day Notice of Cancellation goes into effect on January 29, 2005.

41. Prior to filing suit, Neu Solutions has taken every measure possible to reach out to A.C. Moore and James Mitchell to resolve this dispute and the anticipatory breach of A.C. Moore. Neu Solutions efforts were repeatedly and improperly rebuffed. This is demonstrated in Neu Solutions letter dated January 6, 2005, attached as Exhibit 6.

42. Without relief Neu Solutions faces bankruptcy.

43. The actions of the Defendants and each of them are sufficiently willful, wanton or reckless to justify awarding Neu Solutions punitive damages.

*Count One*

44. Neu Solutions reiterates each assertion as set forth in paragraph 1 through 43 as if expressly set forth here again.

45. A.C. Moore is in breach of the Cleaning Agreement.

Wherefore, Neu Solutions demands judgment against A.C. Moore for $1,800,000 in compensatory damages and $1,000,000 in punitive damages

*Count Two*

46. Neu Solutions reiterates each assertion as set forth in paragraph 1 through 43 as if expressly set forth here again.

47. A.C. Moore is in anticipatory breach of the Cleaning Agreement.

Wherefore, Neu Solutions demands judgment against A.C. Moore for $1,800,000 in compensatory damages and $1,000,000 in punitive damages

*Count Three*

48. Neu Solutions reiterates each assertion as set forth in paragraph 1 through 43 as if expressly set forth here again.

49. A. C. Moore's conduct violates the implied covenant of good faith contained in the Cleaning Agreement.

Wherefore, Neu Solutions demands judgment against A.C. Moore for $1,800,000 in compensatory damages and $1,000,000 in punitive damages

*Count Four*

50. Neu Solutions reiterates each assertion as set forth in paragraph 1 through 43 as if expressly set forth here again.

51. Blue Chip is in breach of the Subcontractor Agreement.

Wherefore, Neu Solutions demands judgment against Blue Chip $1,800,000 in compensatory damages and $1,000,000 in punitive damages

*Count Five*

52. Neu Solutions reiterates each assertion as set forth in paragraph 1 through 43 as if expressly set forth here again.

53. Blue Chip is in anticipatory breach of the Subcontractor Agreement.

Wherefore, Neu Solutions demands judgment against Blue Chip $1,800,000 in compensatory damages and $1,000,000 in punitive damages

*Count Six*

54. Neu Solutions reiterates each assertion as set forth in paragraph 1 through 43 as if expressly set forth here again.

55. James Mitchell and A.C. Moore tortiously interfered with the Cleaning Agreement.

Wherefore, Neu Solutions demands judgment against James Mitchell and A.C. Moore for $1,800,000 in compensatory damages and $1,000,000 in punitive damages

*Count Seven*

56. Neu Solutions reiterates each assertion as set forth in paragraph 1 through 43 as if expressly set forth here again.

57. James Mitchell and A.C. Moore tortiously interfered with the Subcontractor Agreement.

Wherefore, Neu Solutions demands judgment against James Mitchell and A.C. Moore for $1,800,000 in compensatory damages and $1,000,000 in punitive damages.

*Count Eight*

58. Neu Solutions reiterates each assertion as set forth in paragraph 1 through 43 as if expressly set forth here again.

59. Joseph Lombardi, Blue Chip, and Infinity tortiously interfered with the Cleaning Agreement.

Wherefore, Neu Solutions demands judgment against Joseph Lombardi, Blue Chip and Infinity for $1,800,000 in compensatory damages and $1,000,000 in punitive damages.

*Count Nine*

60. Neu Solutions reiterates each assertion as set forth in paragraph 1 through 43 as if expressly set forth here again.

61. Neu Solutions requests this Court to construe and declare their rights, status and other legal relations vis. a vis. A. C. Moore, Joseph Lombardi, Blue Chip and/or Infinity regarding the Cleaning Agreement and the Subcontractor Agreement — and declare:

A. Neu Solutions is performing the Cleaning Agreement;

B. A. C. Moore is in breach or anticipatory breach of the Cleaning Agreement.

C. Joseph Lombardi and Blue Chip are in breach of the Subcontractor Agreement.

D. A.C. Moore is not acting in good faith.

WHEREFORE, Neu Solutions seek a declaration of its rights and responsibilities in relation to the Cleaning Agreement and the Subcontractor Agreement.

*Count Ten*

62. Neu Solutions reiterates each assertion as set forth in paragraph 1 through 43 as if expressly set forth here again.

63. Neu Solutions:

1. Is in compliance with the Cleaning Agreement and will probably succeed on the merits of that dispute;

2. Is in compliance with the Subcontractor Agreement and will probably succeed on the merits of that dispute;

3. Will suffer irreparable harm absent injunctive relief; and

3. Has no adequate remedy at law to prevent incurring thousands of dollars of moving, relocation and storage costs.

64. Balancing the equities favors granting injunctive relief to Neu Solution to preserve the status quo.

Wherefore, Neu Solutions requests an equitable injunction as follows:

1. That, without A.C. Moore adequately and fairly compensating Neu Solutions for the Cleaning equipment and cleaning supplies at the locations of A.C. Moore after January 31, 2005, it not remove or use the same.

2. That A.C. Moore adequately and fairly compensate Neu Solutions for the Cleaning equipment and cleaning supplies at the locations of A.C. Moore as of January 31, 2005.

3. That, without A.C. Moore, Joseph Lombardi, Blue Chip and/or Infinity adequately and fairly compensating Neu Solutions for its net profit on the Cleaning Contract, that A.C. Moore, Joseph Lombardi, Blue Chip and/or Infinity be enjoined from consummating any cleaning services contract for services to A.C. Moore.

4. That, without A.C. Moore adequately and fairly compensating Neu Solutions for its net profit on the Cleaning Contract, that A.C. Moore be enjoined from consummating any cleaning services contract for services to A.C. Moore performed by any current subcontractor of Neu Solutions.

Signed under oath:

______________________________
Richard J. Miguel

STATE OF RHODE ISLAND
COUNTY OF KENT

In WARWICK on the 6th day of JANUARY, 2005, before me personally appeared RICHARD J. MIGUEL to me known and known by me to be the party executing the foregoing instrument, and he acknowledged the said instrument, by him so executed to be his free act and deed.

______________________________, ~~Notary~~ Public
Print Notary's name: Stephen R. White
My Commission Expires: November 20, 2005

I hereby enter my appearance as trial counsel for

Richard J. Miguel.

______________________________
Stephen R. White, Esq. (2372)
200 Centerville Road, Suite One
Warwick, RI 02886
(401) 732-3939

COPY ①

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** ("Agreement") is made and entered into as of October 1, 2004, by and between **NEU SOLUTIONS FACILITIES SERVICES, LLC**, a Rhode Island limited liability company with a business address of 69 Montgomery Street, Pawtucket, Rhode Island 02860, or its assignee ("Buyer"), and Blue Chip Services, LTD, a Delaware limited liability corporation with a business address of 501 Silverside Road, Suite 90, Wilmington, Delaware 19809 ("Seller").

1. ASSETS. Buyer hereby agrees to buy from Seller and Seller hereby agrees to sell to Buyer, on the terms and conditions hereinafter stated, all of Seller's right, title and interest in and to the equipment, including any warranties or service contracts related thereto, described in Exhibit A(1) ("Lot 1 Equipment") attached hereto and Exhibit A(2) attached hereto ("Lot 2 Equipment") (Lot 1 Equipment and Lot 2 Equipment collectively to be referred to as the "Assets"). No other assets of Seller shall be sold, transferred, or assigned to Buyer other than the Assets. The Assets shall be sold, transferred and assigned to Buyer, free and clear of any liabilities, claims, liens, charges or encumbrances of any nature whatsoever.

2. PURCHASE PRICE. The purchase price to be paid by Buyer to Seller for the Assets shall be the sum of Sixty-one Thousand and 00/100 Dollars ($61,000.00) (the "Purchase Price") payable in two separate payments as follows:

(a) On October 1, 2004, the Buyer shall purchase the Lot 1 Equipment for the sum of Thirty Thousand Five Hundred and 00/100 Dollars ($31,500.00) in accordance with the terms of this Agreement; and

(b) On November 1, 2004, The Buyer shall purchase the Lot 2 Equipment for the sum of Thirty Thousand Five Hundred and 00/100 Dollars ($31,500.00) in accordance with the terms of this Agreement.

3. CLOSING. The closing of the purchase and sale of the Assets (the "Closing") shall take place at 1:00 p.m. on October 1, 2004 (or on such date as is mutually agreeable to Buyer and Seller, but such date shall be no later than October 15,2004 (15) days subsequent to the date that Seller executes this Agreement) (the "Closing Date"). At Closing, Seller and Buyer shall take such actions and deliver such agreements and other instruments and documents necessary or appropriate to effect the transactions contemplated by this Agreement in accordance with the terms hereof, including, without limitation, the following:

(a) Seller shall convey title in and to the Assets and shall deliver to Buyer a "Bill of Sale" covering the Assets in the form attached hereto as Exhibit B;

(b) Seller shall deliver to Buyer such further deeds, bills of sale, endorsements/assignments, documents of title, and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as shall be effective to vest in Buyer all of the Sellers' title to, and interest in, the Assets under applicable law;

(c) Seller shall deliver to Buyer a certified copy of resolutions duly adopted by the [board of directors] and [stockholders/members/partners] of Seller authorizing and approving the execution and delivery of this Agreement and performance by Seller of its obligations hereunder;

(d) Seller shall deliver to Buyer a certificate, dated the Closing Date and executed by the [president] of the Seller, certifying that Seller has performed all the agreements and covenants of Seller specified in this Agreement to be performed by Seller on or before the Closing Date;

(e) Seller shall deliver possession of the Assets to be transferred pursuant to this Agreement; and

(f) Seller shall execute and deliver a certificate confirming that all representations and warranties made in this Agreement are true, correct and accurate as of the date of the Closing.

4. CONDITION OF ASSETS UPON DELIVERY. Upon delivery pursuant to the terms of this Agreement, Seller shall deliver to Buyer full possession of the Assets, free and clear of any liabilities, claims, liens, charges or encumbrances of any nature whatsoever, the Assets to be in the same condition as the Assets are as of the date of this Agreement, subject to reasonable use and wear thereof.

5. REPRESENTATIONS AND WARRANTIES.

(a) Buyer hereby covenants, warrants and represents that Buyer is a limited liability company duly organized under the laws of the state of Rhode Island, and has full limited liability company power to carry on its business as now conducted and has limited liability company authority to purchase the Assets.

(b) Seller hereby covenants, warrants and represents as follows:

(i) Seller is a Corporation duly organized and existing under the laws of the State of Delaware and is in good standing under such laws.

(ii) Seller has all requisite corporate power to enter into this Agreement and will have at the Closing Date all requisite corporate power to sell the Assets and to carry out and perform its obligations under the terms of this Agreement.

(iii) All corporate action on the part of Seller, its directors and shareholders necessary for the authorization, execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated herein has been taken or will be taken prior to the Closing. This Agreement is a valid and binding obligation of Seller, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency and reorganization laws. The execution, delivery and performance by Seller of this Agreement and compliance therewith will not result in any violation of and will not conflict with, or result in a breach of any of the terms of, or constitute a default under, any provision of state or federal law to which Seller or the

Assets are subject, Seller's Articles of Incorporation or By-Laws, or any mortgage, indenture, agreement, instrument, judgment, decree, order, rule or regulation or other restriction to which Seller is a party or by which it is bound, or result in the creation of any mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of Seller pursuant to any such term.

(iv) Seller has good and marketable title to the Assets and the Assets are, and will be transferred to Buyer, free and clear of any liabilities, liens, charges, encumbrances, adverse claims, options to purchase or restrictions or conditions on transfer.

(v) There is no suit, action, arbitration or legal, administrative or other proceeding or governmental investigation threatened or pending against or affecting the Assets, nor does Seller know or have reasonable grounds to know of any basis for any such action or proceeding. There is no pending or threatened action, proceeding or investigation for any injunction, writ, preliminary restraining order or any order of any nature issued by any court or governmental agency, domestic or foreign, of competent jurisdiction directing the transactions contemplated by this Agreement not be consummated, and no such injunction, writ, preliminary restraining order or such other order has been issued or is in effect. There is no suit, action or other proceeding, pending or threatened, before any court or governmental agency in which it is sought to obtain damages or other relief in connection with this Agreement or any of the transactions contemplated hereby and Seller knows of no basis for such suit, action or other proceeding.

(vi) Seller is not currently operating under license agreements from any person or entity relating to the use of any of the Assets.

(vii) Seller has not violated or is currently in violation of, and the consummation of the transactions contemplated hereby will not cause any violation of, any order of any governmental entity or any law, ordinance, regulation, order, requirement, statute, rule, permit, concession, grant, franchise, license or other governmental authorization relating or applicable to the Assets.

(viii) None of the Assets is subject to any lien for taxes that are delinquent or due and payable.

(ix) All of the tangible assets comprising the Assets are in operating condition.

(x) There are no filings, recordings or registrations (including, without limitation, Uniform Commercial Code filings) now in effect which evidence, indicate or provide notice of any claims, liens, encumbrances or other security interests on or against the Assets or the proceeds of any of them.

All representations and warranties of Seller contained in this Agreement shall be true on and as of the Closing Date and shall survive the Closing Date.

6. <u>FURTHER ASSURANCES</u>. Seller, from time to time after the Closing Date, at Buyer's request, will execute, acknowledge and deliver to Buyer such other instruments of conveyance and transfer and will take such other actions and execute and deliver such other

documents, certifications and further assurances as Buyer may reasonably require in order to vest more effectively in Buyer, or to put Buyer more fully in possession of, any of the Assets. Buyer and Seller hereby covenant and agree to use their respective best efforts to take such action to execute such documents and instruments as may be reasonably required by the other to more effectively effectuate the purposes of this Agreement from time to time after the Closing Date.

7. INDEMNIFICATION. Seller agrees to indemnify, defend and hold Buyer and each of its officers, directors, employees, agents, members, attorneys and controlling parties and their respective successors and assigns (each, a "Buyer Indemnified Party") harmless from and against and, in respect of the entirety of any and all liabilities, losses, damages, demands, assessments, claims, costs and expenses (including interest, awards, judgments, penalties, settlements, fines, costs and expenses incurred in connection with investigating and defending any claims or causes of action (including, without limitation, attorneys' fees and expenses) actually suffered, incurred or realized by such party, arising out of or resulting from any breach of representation or warranty or breach of any covenant or agreement made or undertaken by Seller in this Agreement. This provision shall survive Closing.

8. TRANSFER OF RISK AND TITLE. Subject to consummation of the Closing, title to the Assets and risk of loss, damage, or destruction shall be deemed to have passed to Buyer upon delivery of the Assets.

9. SALES, TRANSFER AND OTHER TAXES. Sellers shall pay all sales, transfer and other taxes arising out of the transfer of the Assets.

10. DESTRUCTION. If, prior to the delivery of the Assets, the Assets suffer damage by casualty all or any portion of, then Seller shall promptly notify Buyer of the same and, at Buyer's option, Buyer may terminate this Agreement whereupon the parties shall be relieved of all further obligations or liabilities hereunder or Buyer may elect to proceed with the performance of this Agreement and accept the Assets in their then condition, subject to a mutually agreeable and equitable reduction in the Purchase Price reflective of the damage to the Assets.

11. DEFAULT; DAMAGES, ETC.

(a) If Buyer breaches this Agreement or shall fail to perform the obligations and conditions to be performed and satisfied by it hereunder, Seller may pursue any and all remedies available to it in equity, including but not limited to a suit for specific performance or other equitable relief in connection with the matters arising out of this Agreement and the transactions contemplated hereby.

(b) If Seller breaches this Agreement or shall fail to perform the obligations and conditions to be performed and satisfied by it hereunder, Buyer's may pursue any and all remedies available to it in law or equity, including but not limited to a suit for specific performance or other equitable relief in connection with the matters arising out of this Agreement and the transactions contemplated hereby.

12. MISCELLANEOUS.

(a) All covenants, conditions, representations, warranties and agreements of the parties contained herein shall be binding upon and inure to the benefit of their respective heirs, beneficiaries, legal representatives, successors and assigns.

(b) This Agreement (including all exhibits annexed hereto) contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings, if any, with respect thereto. This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged or by its agent duly authorized in writing or as otherwise expressly permitted herein. The provisions of this section shall survive the Closing.

(c) No supplement, modification or amendment of this Agreement shall be binding upon the parties unless executed in writing by the party against whom enforcement is sought.

(d) Whether or not the transactions contemplated by this Agreement are consummated, other than as expressly provided for herein, each of the parties hereto shall pay the fees and expenses of its respective counsel, accountants and other experts, and all other expenses incurred by such party incident to the negotiation, preparation and execution of this Agreement and consummation of the transactions contemplated hereby, provided that the expenses of Seller shall not be paid out of the Assets.

(e) If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

(f) Any notice, request, instruction or other document to be given hereunder by either party to the other party shall be in writing and delivered personally, via telecopy (with receipt confirmed) or by registered or certified mail, postage prepaid:

If to Buyer, to:

Neu Solutions Facilities Services, LLC
69 Montgomery Street
Pawtucket, Rhode Island 02860
Attn: Richard J. Miguel
Facsimile: (401) 725-6511

with copies to:

Antonio Afonso, Jr., Esquire.
Moses & Afonso, Ltd.
170 Westminster Street, Suite 201
Providence, Rhode Island 02903
Facsimile: (401) 453-3604

If to Seller, to:
Blue Chip Services, LTD
PO Box 1100
Sharon Hill, PA 19079

with copies to:

N/A

or at such other address for a party as shall be specified by like notice. Any notice which is delivered personally in the manner provided herein shall be deemed to have been duly given to the party to whom it is directed upon actual receipt by such party (or its agent for notices hereunder). Any notice which is addressed and mailed in the manner herein provided shall be conclusively presumed to have been duly given to the party to which it is addressed at the close of business, local time of the recipient, on the third day after the day it is so placed in the mail. Any notice which is sent by telecopy shall be deemed to have been duly given to the party to which it is addressed upon telephonic confirmation of the same as provided herein. A copy of any notices delivered by telecopy shall promptly be mailed in the manner herein provided to the party to which such notice was given.

(g) This Agreement and all matters connected with the performance thereof shall be construed, interpreted, and governed in all respects by the laws of the state of Rhode Island.

(h) Seller agrees that it will not disclose, and Seller will use its best efforts to prevent disclosure by any person having any confidential information included within the Assets.

(i) Each party to this Agreement represents and warrants to each other party that no other person or firm brought about the sale or is entitled to compensation in respect to it and no brokers have been involved in the sale. Any party breaching this warranty shall indemnify and hold harmless the non-breaching party from any losses or damages suffered by such non-breaching party.

(j) Buyer may assign this Agreement to an entity controlled in its entirety by Buyer or an entity in which Buyer or a principal of Buyer has a majority interest without Seller's consent.

(k) This Agreement may be executed in counterparts, each of which shall be deemed an original. The captions are for convenience of reference only and shall not affect the construction to be given any of the provisions hereof.

**[SIGNATURES APPEAR ON NEXT PAGE]**

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the date first written above.

SELLER:

Blue Chip Services, LTD a Delaware Corporation

By: ______________________
Name: Joseph J. Lombardi
Title: President

BUYER:

NEU SOLUTIONS FACILITIES SERVICES, LLC,
a Rhode Island limited liability company

By: ______________________
Richard J. Miguel, President

The undersigned, Joseph J. Lombardi, personally and individually guaranties the payment and performance of all covenants, agreements and other obligations of Blue Chip Services, LTD, the Seller contained in this Asset Purchase Agreement.

______________________
Print Name: Joseph J. Lombardi

# EXHIBIT A (1)

## LOT 1 EQUIPMENT

| STORE # | CURRENT LOCATION | DESCRIPTION | SERIAL NUMBER | VALUE |
|---|---|---|---|---|
| | PURCHASED BETWEEN JUNE 2002 AND SEPTEMBER 1, 2004 (33) | | | |
| 7 | BENSALEM, PA | 24" AZTEC BURNISHER | 0140562 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 9 | BROOMALL, PA | 24" AZTEC BURNISHER | 0140571 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 11 | BINGHAMTON, NY | 24" AZTEC BURNISHER | 0140609 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 13 | HARRISBURG, PA | 24" AZTEC BURNISHER | 0140582 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 17 | LANCASTER, PA | 24" AZTEC BURNISHER | 0140767 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 18 | DOVER, DE | 24" AZTEC BURNISHER | 0140589 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 19 | MIDDLETOWN, NY | 24" AZTEC BURNISHER | 0140572 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 20 | DOWNINGTOWN, PA | 24" AZTEC BURNISHER | 0140610 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 26 | SCRANTON, PA | 24" AZTEC BURNISHER | 0140804 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 27 | CLAY, NY | 24" AZTEC BURNISHER | 0140611 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 30 | BELLINGHAM, MA | 24" AZTEC BURNISHER | 0140762 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 31 | GLEN BURNIE, MD | 24" AZTEC BURNISHER | 0140496 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 32 | DANVERS, MA | 24" AZTEC BURNISHER | 0140706 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 33 | HOLYOKE, MA | 24" AZTEC BURNISHER | 0140552 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 36 | UTICA, NY | 24" AZTEC BURNISHER | 0140745 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 40 | PLAINVILLE, NY | 24" AZTEC BURNISHER | 0140495 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 41 | FREDERICK, MD | 24" AZTEC BURNISHER | 0140727 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 46 | HAGERSTOWN, MD | 24" AZTEC BURNISHER | 0140591 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 48 | HICKORY, NC | 24" AZTEC BURNISHER | 0140839 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |

## EXHIBIT A (1)

## LOT 1 EQUIPMENT (CON'T)

| STORE # | CURRENT LOCATION | DESCRIPTION | SERIAL NUMBER | VALUE |
|---|---|---|---|---|
| 49 | MUNCY, PA | 24" AZTEC BURNISHER | 0140842 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 56 | CLARKSBURG, WV | 24" AZTEC BURNISHER | 0140748 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 59 | HANOVER, PA | 24" AZTEC BURNISHER | 0140559 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 63 | PORTLAND, ME | 24" AZTEC BURNISHER | 0140586 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 64 | ROCKVILLE, MD | 24" AZTEC BURNISHER | 0140645 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 65 | BAILEY FALL, VA | 24" AZTEC BURNISHER | 0140598 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 67 | KNOXVILLE, TN | 24" AZTEC BURNISHER | 0140561 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 68 | N. CHARLESTON, SC | 24" AZTEC BURNISHER | 0140565 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 69 | WOBURN, MA | 24" AZTEC BURNISHER | 0140837 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 70 | FAYETTEVILLE, NC | 24" AZTEC BURNISHER | 0140707 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 71 | MANCHESTER, CT | 24" AZTEC BURNISHER | 0140794 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 72 | BARBOURSVILLE, WV | 24" AZTEC BURNISHER | 0140573 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 73 | ITHACA, NY | 24" AZTEC BURNISHER | 0140556 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 74 | ERIE, PA | 24" AZTEC BURNISHER | 0140844 | $800. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| | | PURCHASED BEFORE JUNE 2001 (2) | | |
| 5 | READING, PA | 24" AZTEC BURNISHER | 0112422 | $300 |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 12 | BRICKTOWN, NJ | 21" AZTEC BURNISHER | ____________ | $300. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |

**TOTAL: $30,500**

## EXHIBIT A(2)

## LOT 2 EQUIPMENT

| STORE # | CURRENT LOCATION | DESCRIPTION | SERIAL NUMBER | VALUE |
|---|---|---|---|---|
| | | PURCHASED BETWEEN JUNE 2002 AND SEPTEMBER 1, 2004 (10) | | |
| 75 | MONTGOMERY, AL | 24" AZTEC BURNISHER | 0140596 | $800. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 76 | VIRGINIA BEACH, VA | 24" AZTEC BURNISHER | __________ | $800. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 77 | COLUMBIA, SC | 24" AZTEC BURNISHER | 0140691 | $800. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 78 | COLUMBUS, GA | 24" AZTEC BURNISHER | 0140712 | $800. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 79 | SALEM, NH | 24" AZTEC BURNISHER | 0140835 | $800. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 80 | HAMBURG, NY | 24" AZTEC BURNISHER | 0140728 | $800. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 82 | MECHANICSBURG, PA | AZTEC BURNISHER | __________ | $800. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 84 | HAUPPAUGE, NY | 24" AZTEC BURNISHER | 0140833 | $800. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 86 | WILKES- BARRE, PA | 24" AZTEC BURNISHER | 0140870 | $800. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 87 | HOOVER, AL | 24" AZTEC BURNISHER | 0140841 | $800. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| | | PURCHASED BETWEEN JUNE 2001 AND MAY 2002 (19) | | |
| 1 | MOORESTOWN, NJ | 24" AZTEC BURNISHER | 0140505 | $600. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 2 | DEPTFORD, NJ | 24" AZTEC BURNISHER | 0140511 | $600. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 6 | ALLENTOWN, PA | 24" AZTEC BURNISHER | 0140492 | $600. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 8 | WILMINGTON, DE | 24" MINUTEMAN BURNISHER | UM220021K170909 | $600. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 10 | EAST BRUNSWICK, NJ | 24" AZTEC BURNISHER | 0140493 | $600. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 14 | HAMILTON, NJ | 24" AZTEC BURNISHER | 0140446 | $600. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 16 | LATHAM, NY | 27" AZTEC BURNISHER | 0140471 | $600. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |
| 23 | ORANGE, CT | 24" AZTEC BURNISHER | 0140466 | $600. |
| | | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | $100. |

## EXHIBIT A(2)

## LOT 2 EQUIPMENT ( CON'T)

| STORE # | CURRENT LOCATION | DESCRIPTION | SERIAL NUMBER | VALUE |
|---|---|---|---|---|
| 24 | PARSIPPANY, NJ | 24" AZTEC BURNISHER | 0140479 | $600. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 29 | YORKTOWN, NY | 24" AZTEC BURNISHER | ____________ | $600. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 39 | NORTH DARTMOUTH, MA | 21" BURNISHER | ____________ | $600. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 43 | CONCORD, NC | 24" AZTEC BURNISHER | 0140441 | $600. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 51 | ALTOONA, PA | 24" AZTEC BURNISHER | 0140443 | $600. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 55 | SARATOGA SPRINGS, NY | 24" AZTEC BURNISHER | 0140508 | $600. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 57 | WATCHUNG, NJ | 24" AZTEC BURNISHER | 0140449 | $600. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 58 | GREENVILLE, SC | 24" AZTEC BURNISHER | 0140530 | $600. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 61 | LINDEN, NJ | 24" AZTEC BURNISHER | 0140481 | $600. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 62 | SOUTH PHILADELPHIA, PA | 24" AZTEC BURNISHER | 0140484 | $600. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 81 | AMHERST, NY | 24" AZTEC BURNISHER | 0140412 | $600. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| | PURCHASED BEFORE JUNE 2001 (13) | | | |
| 15 | MONTGOMERYVILLE, PA | 24" AZTEC BURNISHER | BF2701199 | $300. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 21 | POUGHKEEPSIE, NY | 24" AZTEC BURNISHER | ____________ | $300. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 22 | NANUET, NY | 24" AZTEC BURNISHER | BF2701164 | $300 |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 42 | WINSTON-SALEM, NC | 24" AZTEC BURNISHER | 0140405 | $300 |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 44 | NEW LONDON, CT | 27" AZTEC BURNISHER | BF2701162 | $300. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 45 | WILMINGTON, NC | 21" AZTEC BURNISHER | ____________ | $300. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 47 | LANGHORNE, PA | 21" AZTEC BURNISHER | ____________ | $300. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100. |
| 50 | CLIFTON, NJ | 24" MINUTEMAN BURNISHER | TM220024KI70855 | $300. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100 |
| 52 | CARY, NC | 21" AZTEC BURNISHER | ____________ | $300. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100 |

## EXHIBIT A(2)

### LOT 2 EQUIPMENT ( CON'T)

| STORE # | CURRENT LOCATION | DESCRIPTION | SERIAL NUMBER | VALUE |
|---|---|---|---|---|
| 53 | RALEIGH, NC | 27" AZTEC BURNISHER | BF2701172 | $300 |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100 |
| 60 | SHREWSBURY, NJ | 27" AZTEC BURNISHER | BF2701472 | $300. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100 |
| 66 | FAIRFAX, VA | 27" AZTEC BURNISHER | 2701318 | $300. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100 |
| 88 | STROUDSBURG, PA | 21" BURNISHER | ____________ | $300. |
| | MISCELLANEOUS SUPPLIES, MATERIALS AND EQUIPMENT | | | $100 |

<u>SCRUBBERS</u>

| STORE # | LOCATION | DESCRIPTION | SERIAL NUMBER | |
|---|---|---|---|---|
| 27 | CLAY, NY | 17" AUTO SCRUBBER | ____________ | $640 |
| 32 | DANVERS, MA | 17" AUTO SCRUBBER | ____________ | $640 |
| 40 | PLAINVILLE, CT | 17" AUTO SCRUBBER | 9P1248 | $640 |
| 74 | ERIE, PA | 17" AUTO SCRUBBER | 9P1210 | $640 |
| 79 | SALEM, NH | 17" AUTO SCRUBBER | 9P0853 | $640 |

<u>TOTAL: $30,500</u>

## EXHIBIT B

## BILL OF SALE

**KNOW ALL MEN BY THESE PRESENTS THAT** Blue Chip Services, LTD, in consideration of the sum of Sixty-one thousand and 00/100 dollars ($61,000.00) Dollars and other good and valuable consideration paid, the receipt of which is hereby acknowledged, does hereby grant, assign and convey all of its right, title and interest in and to all of the following described assets to **NEU SOLUTIONS FACILITIES SERVICES, LLC**, a Rhode Island limited liability company, or its assignee:

> All of the Assets described in the Asset Purchase Agreement which was entered into on October 1, 2004 by and between Blue Chip Services, LTD and Neu Solutions Facilities Services, LLC, or its assignee, and which agreement for purposes of asset descriptions is hereby incorporated into this Bill of Sale, but for no other purpose.

TO HAVE AND TO HOLD, the said Assets to said Neu Solutions Facilities Services, LLC, and its successors and assigns, to their use and behoof forever. And I, Joseph J. Lombardi, in my capacity as President of Blue Chip Services, LTD hereby covenants with said Neu Solutions Facilities Services, LLC, its successors and assigns that Blue Chip Services, LTD is the lawful owners of the said assets; that said assets are free of all liens and encumbrances; that Blue Chip Services, LTD has good right and lawful authority to sell and convey the same aforesaid; and that Blue Chip Services, LTD will warrant and defend the same against the lawful claims and demands of all persons.

IN WITNESS WHEREOF, the undersigned has executed this Bill of Sale the 1st day of

October, 2004.

10/5/04

NOTARIAL SEAL
[illegible], Notary Public
Sharon Hill, Delaware County
My Commission Expires February 25, 2007

By: ______________________
Name: Joseph J. Lombardi
Title: President

MIGUEL\Neu Solutions\Equipment Purchase 2004\Asset Purchase Agreement 9-29-04.doc

(2)

**Store 054 Store PC**

**From:** Jim Mitchell
**Sent:** Monday, August 02, 2004 11:41 AM
**To:** _Stores (Stock Office)
**Subject:** Attn: STORE MANGERS - New National Cleaning Agreement

Monday, August 02, 2004

**AC MOORE National Cleaning Contract Bid:**

To: Regional Vice Presidents
All Store Mangers

From: Jim Mitchell - Director of Store Planning

In an effort to look for ways to reduce operating expense and manage our processes better, I have put our entire stores cleaning service out to bid. The results of the bid show us that we have the potential to save approximately a half million dollars a year. This means individual savings per store. We will also be saving on time when it comes to processing the invoicing and bill paying; we will have 1 invoice for all the stores. Letters to the existing cleaning services will be sent today terminating service, the last day of old service being September 2, 2004. It will be important for the stores to document with the new service provider on their weekly work reports. This will allow us a tool to police the service. AC Moore will be held to the terms of the agreement; any changes or modifications will come through my office. No store will be able to cancel or change services going forward, this is why it is imperative that the reporting be done so if a problem arises it can be tracked to determine if it is an ongoing issue. I can then take the appropriate action to remedy the problem. Neu Solutions will be the new provider; they will be in contact with all the Regional Vice Presidents to go over the service details. The bid was done based on a 5-day a week cleaning, 2 scrubs and a strip a year. If your store requires additional services please convey that information to Neu Solutions in their initial meeting. Neu Solutions will be contacting each store as well to go over the stores individual schedules and service. If there are any questions, please feel free to contact me at ext. 175. I appreciate everyone's cooperation in making this change and transition.

Cc: Jack Parker
Les Gordon
Jack Robinson
Jason Cesare
Mike Doto

A.C. MOORE

Wednesday, August 25, 2004

To: Neu Solutions Facilities Services, LLC
Attn: Richard Miguel
69 Montgomery Street
Pawtucket, RI 02860
800-286-9016

Dear Rick,

Enclosed are 2 copies of the Cleaning Agreement between AC Moore, Inc. and Neu Solutions Facilities Services, LLC. Please sign both copies and forward one copy back to me. I look forward to building a long-term relationship with you and your company. Please don't hesitate to call me if you have any questions.

Sincerely,

Jim Mitchell. ISP
Director Of Store Planning
AC Moore, Inc.
130 AC Moore Drive
Berlin, NJ 08009

A.C. MOORE

Tuesday, August 24, 2004

## AC Moore 2005 National Cleaning Agreement:

This agreement will be valid for the time stated, Starting September 3, 2004 and ending on December 1, 2005. After the first year, service will be evaluated and if it is found to be satisfactory the contractor will be given the opportunity to renew the agreement for another year based on the same terms and conditions. This will also include new stores as they come on line.

1. **CLEANING PERSONNEL:** The Service provided will be performed by qualified personnel, they must be trained in the use of all equipment used in the cleaning of an AC MOORE store, they must have a complete understanding of all chemicals and cleaning solvents that they may use in the cleaning of an AC MOORE store and the correct storage of those solvents. No illegal aliens will be permitted to work; all cleaning personnel must have the legal documentation to work in the USA. Proof of this documentation must be made available when requested by a representative of AC MOORE. Should the cleaning contractor unknowingly hire an illegal alien and it results in legal ramifications with any governmental agency, AC MOORE will be held harmless. Neu Solutions Facilities Services, LLC and any contractors hired to perform cleaning services under the management of Neu Solutions Facilities Services, LLC shall be held responsible.
2. **INSURANCE:** Neu Solutions Facilities Services, LLC must maintain valid insurance as part of the contract agreement. Shown in the following minimum amounts:
   - **A.** Workers Compensation: State Limits
   - **B.** Liability: $2,000,000
   - **C.** Non-Owned Auto: $500,000
   - **D.** Umbrella Coverage: $10,000,000
   - **E.** Janitorial Bond $500,000
3. **PERFORMANCE:** It is imperative that the stores look their best on a regular basis. Because of this AC Moore must receive quality cleaning services. When performing any of the listed services, clean mop heads, clean buffing & scrubbing heads, etc will be used. All services must be signed off to the satisfaction of the store manager of each location in the AC MOORE chain. Should the manager not sign off, then the cleaning contractor will be required to remedy the issues to the managers satisfaction at the cost of the cleaning contractor. If the cleaning contractor specifies a specific remedy for a cleaning issue and the store manager rejects the remedy, it must be noted and signed off on the cleaning contractors Cleaning Service Report (attachment A). **Non performance**, the inability to provide cleaning personnel on a regular schedule. Continued Service interruption will not be tolerated and will lead to cancellation of this contract in part or the entire AC MOORE chain. AC MOORE also reserves the right to cancel the contract should there be on going performance and cleanliness issues as noted on the daily service tickets. 30-day notice will be given should the contract be cancelled.

Tuesday, August 24, 2004

4. **DAMAGE:** Any damage done by the assigned cleaning contractor to an AC MOORE store because of misuse or lack of training in the use of cleaning equipment and supplies will be charged back to Neu Solutions Facilities Services, LLC. The term "Damage" is not isolated to just the physical building plant but to the store fixtures, equipment and merchandise.
5. **THEFT:** Will not be tolerated by any cleaning personnel, cleaning personnel will be prosecuted to the full extent of the law if found to be stealing from AC MOORE. All loses will be reimbursed by Neu Solutions Facilities Services, LLC. The security agreement (attachment B) must be signed and dated. A copy must be sent to Neu Solutions Facilities Services, LLC prior to starting any work in the assigned stores. Every time a new individual is added to the list and has signed it, it must be immediately faxed to Neu Solutions Facilities Services, LLC to have on file. Failure to do so will be grounds for terminating the contract.
6. **PAYMENT & RECORD KEEPING:** One invoice will be generated to encompass all locations. Invoicing at the beginning of each month for daily service to be performed that month, should any service be missed it will be made up or a credit will be issued and be sent to AC Moore corporate offices. Terms will be net 30. Accompanying the invoice will be any requests for additional services (attachment C) and the daily service reports for all stores from the prior month in an electronic format. All reports and backup by store will be in an excel format file and saved to a CD disk, the disk will be sent with the invoice each month. Neu Solutions Facilities Services, LLC will implement an Internet accessible system for viewing daily service reports, requests for additional services, etc.

   The invoice submitted for payment each month must be broken down by each store, showing the charges per store including the sales tax by the state in which each store resides. This is considered the backup, mentioned above. It is the responsibility of the Neu Solutions Facilities Services, LLC to collect the appropriate sales tax per individual state.

A.C.MOORE

Tuesday, August 24, 2004

**AC Moore CLEANING SERVICE CRITERIA.**

***All Services should be based on an average store size of 21,000 Sq. Ft.***

## DAILY SERVICE

The daily service is performed in the stores 5 days per week. The particular days on which service is completed varies from store to store depending on the stores' scheduled warehouse days and other considerations.

The basic daily program includes the following services:

1) The dust mopping of the entire sales floor area, offices, break-room and classroom. All gum, stickers, candy etc. will be scrapped and removed from the floors.
2) The rinsing and the ultra-high speed burnishing of the entire race track area and the entire front of the store. An optically enhanced floor cleaner that leaves no residue will be used as the rinsing agent.
3) The rinsing and ultra high speed burnishing of 1/4 of the remaining store area.
4) The spot mopping of spills in all other areas of the store.
5) *Complete* rest room cleaning, which includes the washing and disinfecting of all rest room fixtures, partitions and floors. All walls and partitions will be spot cleaned. A complete top to bottom cleaning and disinfecting of all rest rooms will be completed twice a year. Cleaning supplies by contractor.
6) Restroom supplies will be replenished each day and all restroom waste receptacles will be emptied. Restroom supplies will be furnished by A C Moore.
7) The vacuuming of all walk-off mats and entrance lobby carpeting.
8) The cleaning of the entrance door glass.
9) The Cleaning service will supply a brand new, top quality, ultra high-speed propane-burnishing machine at the start of services for each store. The equipment will be maintained in good working order or replaced if necessary.
10) All chemicals, buckets, wringers, wet mop heads, wet mop handles and sundry supplies and equipment, needed to complete the above services, will be provided by the Cleaning Service.

**PRICE QUOTE PER MONTH = $ 1175.00**

Tuesday, August 24, 2004

# SCRUB SERVICE

A scrub service is completed in one night. The areas to be completed are prepared for refinishing by a combination of auto-scrubbing, heavy duty wet mopping and if necessary some deep scrubbing in selected areas (e.g. front entrance, check-out lanes, receiving aisles etc.).
A scrub service is utilized for the purpose of revitalizing the appearance of the floors by removing all top soil and applying additional coats of finish to a clean floor surface. It is essential that the floor surfaces be relatively clean with no heavy soil entrapment or deep damage to the existing floor finish.

***SCRUBBING PROCEDURES***
It is not recommended nor is it desirable for tables and counters to be moved during a scrub service. Temporary displays and stacks should be removed from the sales floor so that these areas can be refinished, but time limitations and the very nature of a scrub service preclude moving tables. The floor surfaces will be scrubbed and prepared for refinishing as stated above to remove top soil and a minimum amount of old floor finish. Two coats of ultra high-speed floor finish will then be applied to the remaining floor finish.

**PRICE QUOTE PER SINGLE SERVICE = $525.00**

***STORES REQUIRING ADDITIONAL EQUIPMENT:***
The following stores will maintain a scrubbing machine year round at each location due to more incidents of inclement weather and traffic. Additional cost per store of **$250.00** per month for Neu Solutions Facilities Services, LLC to provide a new Minuteman 200 Traction Drive.

**STORES By number:** 22, 23, 40, 44, 25, 30, 32, 33,35,39,54, 63, 69, 83, 37, 79,19, 21, 27, 36, 55, 80, 81, 84, 85, and 38.

Store 71 owns their own scrubber and will remain that way. It will be up to the store to maintain the equipment in working order.

Additional scrubbers maybe requested for other stores based on the regional vice presidents recommendation. The rate above will apply.

Tuesday, August 24, 2004

## STRIP SERVICE

A strip service is completed on three consecutive nights. A strip is recommended for completion once per year for the purpose of re-establishing a good base on which to build your daily floor care program. Our procedures demand a clean strip and rinse, which leave the floors surfaces with a neutral PH rating. This is most advantageous for having a successful refinishing process.

***STRIPPING PROCEDURE – 1st NIGHT***

At least 50% of the sales floor area will be stripped to bare floor. Two coats of semi-permanent seal are next applied to the floor. Use seals that are specially formulated to protect resilient tile floors from chemical stains such as blacktop coatings, oils, paints and solvents. After the seal dries thoroughly, two coats of floor finish constructed to withstand the rigors of ultra high speed burnishing will be applied to the sealed surfaces. Prior to the stripping process, A C Moore store personnel are to remove all tables, displays, stacks, power panels and portable end caps from the area being stripped.

***STRIPPING PROCEDURE – 2nd NIGHT***

The remainder of the sales floor area will be stripped in the same manner as the first half with the same procedures in effect..

***STRIPPING PROCEDURE – 3rd NIGHT***

All the support areas, such as offices, break-room, classroom and cash office (if accessible) will be stripped, sealed and refinished.
Three additional and final coats of the ultra high-speed floor finish will be applied to the sales floor area with all tables, displays etc. remaining in place. This will be accomplished after the sales floor has been prepped to remove the previous days soil from the floor surfaces.

**PRICE QUOTE PER SINGLE SERVICE. = $2310.00**

The Daily cleaning service is an ongoing process; the other services listed (Strip and Scrub) are budgeted at one Strip and 2 Scrubs per year. The Store Manager and Regional Vice President of each location will determine when to perform the Strips and Scrubs for their stores. The regional vice president from each region must approve the Strip & Scrubs services if a store is over its allotted amount. Should there be a request for additional services not included in the above scenarios or over planned budget, then the cleaning contractor must produce a work order (attachment C) outlining the services provided and cost quote. This work order must be signed by the store manager and a copy submitted to corporate as part of the invoice procedure. If a change order is not signed, it will not be paid. It is the responsibility of Neu Solutions Facilities Services, LLC to get all work orders signed.

Wednesday, August 24, 2004

***NEW STORE START UP SERVICE:***

This is a service to be put in place in a new store or complete renovation. AC Moore will coordinate the timing for the parts of the service to take place. After a New Store Start Up Service has been performed, Neu Solutions Facilities Services, LLC will begin it's normal services as stated above.

**Before Fixtures**

**Strip Service:** This service consists of stripping the floor of all floor finish and applying 4 to 5 coats of finish.

**One Week Prior to Soft Opening**

**Scrub Service:** This service consists of scrubbing the floor and applying 1 to 2 coats of finish.

**Day Before Soft Opening**

**PM Buff Service:** This service consists of auto scrubbing the sales floor and damp mopping all other areas. Burnishing all areas and a thorough cleaning of the restrooms, including floors, walls, fixtures and partitions.

All Services Listed encompass the entire sales floor, lounge, hallways classroom, restrooms and any accessible offices.

**Price Quote for the New Store Start Up Service: $3200.00**

Tuesday, August 24, 2004

The following 7 pages, dated August 24, 2005 along with attachments "A", "B", "C" will be the final agreement between AC Moore, Inc. and Neu Solutions Facilities Services, LLC. Attached for reference is a copy of the original bid. By signing below, both parties agree to the terms set forth in the above agreement, dated August 24, 2004.

For Clarification all references to "Cleaning Contractor" are employees, sub contractors or other persons working for and/or being managed by Neu Solutions Facilities Services, LLC

____________________ Date: 8/25/2004
Signature

Richard Miguel - President

**Neu Solutions Facilities Services, LLC**
69 Montgomery Street
Pawtucket, RI 02860
800-286-9016
rmiguel@neu-solutions.com

____________________ Date: 8/25/2004
Signature

Jim Mitchell, ISP - Director of Store Planning

**AC Moore, Inc.**
130 AC Moore Drive
Berlin, NJ 08009
856-228-6700 ext 175
jimm@acmoore.com

A.C. MOORE

Neu Solutions

# Daily Service Quality/Payment Ticket

800-286-9016

FAX: 401-725-6511

Store # ______________ Date: ______________

**Crew Arrival:**__________ AM/PM **Crew Departure:**________________ AM/PM

**# of Crew Members:** _________

**Service Type:** o Daily

**ATTACHMENT "A"**

**08/24/2004**

**Restroom Sanitation:** 1 2 3

**Sales Floor:**

| | |
|---|---|
| Dust Mopping: 1 2 3 | Offices: 1 2 3 |
| Damp Mopping: 1 2 3 | Lounge: 1 2 3 |
| Buff/Burnish: 1 2 3 | Backroom: 1 2 3 |

**Overall Service Satisfaction:** 1 2 3

______________________________ ______________________________

**Store Manager Name (Print)** **Contractor Name (Print)**

______________________________ ______________________________

**Store Manager Signature** **Contractor Signature**

**AC Moore Comments:** ________________________________________

________________________________________

________________________________________

**Contractor Comments:** ________________________________________

________________________________________

________________________________________

1:Unacceptable 2:Good 3: Excellent

**ATTACHMENT "B"**

**08/24/2004**

# Neu

TO: NEU Solutions Affiliated Contractors

FROM: NEU Solutions Facilities Services, LLC

DATE June 2003

RE: **Security Rules for Contract Floor Cleaners Servicing A.C. Moore**

All owners of floor cleaning services and their employees are to adhere to the following security rules while cleaning any A.C. Moore store.

Cleaning personnel may never enter any A.C. Moore store under the influence of alcohol or drugs. Alcohol or drugs are not to be brought onto the premises for any reason. If a member of cleaning personnel is deemed to be under the influence of alcohol or drugs, or has been observed bringing either onto the premises, he/she will be asked to leave the store immediately. Subsequent to their removal the cleaning crew supervisor or the owner will be notified. Violators will be banned from cleaning A.C. Moore stores.

Cleaning personnel may never enter any A.C. Moore store carrying firearms (whether permitted, licensed or legal). It is prohibited by corporate policy to carry firearms.

Friends and relatives of cleaning personnel and cleaning personnel not scheduled to work are not allowed to enter the store to visit other cleaning personnel. Use of telephones is not allowed unless approved and under the supervision of store management.

Cleaning personnel are not authorized to use any A.C. Moore cleaning solutions or materials that have not been previously provided by NEU Solutions, LLC to clean the store. The purchase of any A.C. Moore merchandise is to be done during the course of normal business hours. Receipts should be attached to any merchandise purchased from A.C. Moore.

Cleaning personnel are not to touch or handle merchandise in the store unless it is specifically related to the job.

Cleaning personnel are not to go behind display counters or enter rear doors not related to the cleaning cycle.

Cleaning crew personnel found to be removing any A.C. Moore property without having paid for or properly accounted for will certainly be banned from cleaning A.C. Moore stores and will **also be subject to criminal prosecution**

**Security Rules for Contract Floor Cleaners** **ATTACHMENT "B"**
**A.C. Moore** **08/24/2004**

A.C. Moore reserves the right to inspect any and all parcels, packages, gym bags, cases, materials and equipment that are in the possession of cleaning personnel when leaving the store.

It is the sole responsibility of the cleaning service owner/supervisor to ensure that his/her employees understand and abide by these rules.

I have read and agree that I and all members of my company will abide by these rules.

Company: ______________________________________

Owner/Supervisor: ______________________________ Date: ______________

Note: This communication is not to be removed from the NEU Solutions, LLC Housekeeping Control Booklet.

Listed below are all contractor personnel (name and signature) assigned to this store location indicating they fully understand the security rules for contract personnel.

| Name – Print | Signature | Date |
| --- | --- | --- |
| • ________________ | ________________ | ________________ |
| • ________________ | ________________ | ________________ |
| • ________________ | ________________ | ________________ |
| • ________________ | ________________ | ________________ |
| • ________________ | ________________ | ________________ |
| • ________________ | ________________ | ________________ |
| • ________________ | ________________ | ________________ |
| • ________________ | ________________ | ________________ |
| • ________________ | ________________ | ________________ |
| • ________________ | ________________ | ________________ |

**ATTACMENT "C"**

**08/24/2004**

A.C.MOORE

# Work Order

Neu Solutions

Store # ________

800-286-9016
FAX: 401-725-6511

Service Requested By: ____________________ Date: ____________
Print

Signature: ________________________________________

Job Description:

| | | | |
|---|---|---|---|
| ☐ Scrub & Recoat: | $ ______ | ☐ Windows: | $ ______ |
| ☐ Strip & Recoat: | $ ______ | ☐ Sidewalks: | $ ______ |
| ☐ Fixture Moves: | $ ______ | ☐ Backroom: | $ ______ |
| ☐ Carpet Extraction: | $ ______ | ☐ Matting: | $ ______ |

☐ Other: ________________________________ $ ______

Total $ ______

Special Instructions: ________________________________________

Scheduling Information: ________________________________________

| | | | |
|---|---|---|---|
| Start Date | | | |
| Job Length (Work hours) | | | |
| Finish Date | | | |

Order Confirmed by: ______________________ Date: ________

Scheduling Assigned by : ______________________ Date: ________

Corporate Approval: ______________________ # ________

Neu Solutions Office Staff AC Moore Store Management

Neu Solutions
FACILITIES SERVICES, LLC

**COPY OF ORIGINAL**
**08/24/2004**

July 22, 2004

James Mitchell
A.C. Moore
500 University Court
Blackwood, NJ 08012

Dear Jim:

I am pleased to present our proposal to A.C. Moore Stores for your 2005 National Cleaning Program Bid. All bid requirements will be adhered to as outlined. I have enclosed equipment and supply information for your review. Additional insurance has been purchased that will go into effect August 15, 2004 to meet the bid requirements.

I look forward to presenting all the benefits of employee/contractor legal status compliance, attendance tracking, fax resolution tracking, paperless invoicing, training, industry leading personnel and a relationship driven management team, that Neu Solutions can provide for A.C. Moore.

I thank you for your consideration and look forward to working with you in the near future.

Sincerely,

Richard J. Miguel
President

69 Montgomery Street • Pawtucket, RI 02860
Phone: 800-286-9016 • Fax: 401-725-3258

COPY OF ORIGINAL

08/24/2004

A.C. MOORE

Tuesday, July 13, 2004

## AC Moore 2005 National Cleaning Program Bid:

AC Moore invites you to participate in the bid for the National Contract for the cleaning services for all retail stores in the AC Moore group. This will also include new stores as they come on line. This contract will be valid for the time stated, Starting _**September 1, 2004**_ and ending on _**December 01, 2005**__. After the first year, service will be evaluated and if it is found to be satisfactory the contractor will be given the opportunity to renew the contract for another year based on the same terms and conditions.

1. **CLEANING PERSONNEL:** The Service provided will be performed by qualified personnel, they must be trained in the use of all equipment used in the cleaning of an AC MOORE store, they must have a complete understanding of all chemicals and cleaning solvents that they may use in the cleaning of an AC MOORE store and the correct storage of those solvents. No illegal aliens will be permitted, all cleaning personnel must have the legal documentation to work in the USA. Proof of this documentation must be available at all times to representatives of AC MOORE. Should the cleaning contractor unknowingly hire an illegal alien and it results in legal ramifications with any governmental agency, AC MOORE will be held harmless.
2. **INSURANCE:** Each cleaning contractor must show proof of valid insurance as part of the bid. Shown in the following minimum amounts:
   - A. Workers Compensation: State Limits
   - B. Liability: $2,000,000
   - C. Non-Owned Auto: $1,000,000
   - D. Umbrella Coverage: $10,000,000
   - E. Janitorial Bond $1,000,000
3. **PERFORMANCE:** It is imperative that the stores look their best on a regular basis. Because of this AC Moore must receive quality cleaning services. When performing any of the listed services, clean mop heads, clean buffing & scrubbing heads, etc will be used. All services must be signed off to the satisfaction of the store manager of each location in the AC MOORE chain. Should the manager not sign off, then the cleaning contractor will be required to remedy the issues to the managers satisfaction at the cost of the cleaning contractor. If the cleaning contractor specifies a specific remedy for a cleaning issue and the store manager rejects the remedy, it must be noted and signed off on the cleaning contractors Cleaning Service Report (see attached). **Non performance**, the inability to provide cleaning personnel on a regular schedule. Service interruption will not be tolerated and will lead to cancellation of this contract in part or the entire AC MOORE chain. AC MOORE also reserves the right to cancel the contract should there be on going performance and cleanliness issues. 30-day notice will be given should the contract be cancelled.

**COPY OF ORIGINAL**

**08/24/2004**

4. **DAMAGE:** Any damage done to an AC MOORE store because of misuse or lack of knowledge and training in the use of cleaning equipment and supplies will be charged back to the cleaning contractor. The term "Damage" is not isolated to just the physical building plant but to the store fixtures, equipment and merchandise.
5. **THEFT:** Will not be tolerated by any cleaning personnel, cleaning personnel will be prosecuted to the full extent of the law if found to be stealing from AC MOORE. All loses will be reimbursed by the cleaning contractor.
6. **PAYMENT & RECORD KEEPING:** One invoice will be generated to encompass all locations. Invoicing will occur once a month and be sent to AC Moore corporate offices. Terms will be net 30. Accompanying the invoice will be any requests for additional services and the service reports for all stores for each month in PDF format. All reports will be in a scanned PDF file and saved to a CD disk, the disk will be sent with the invoice each month. Note: Other suggestions for the electronic record keeping will be considered, as long as it reduces the use of paper.

The invoice submitted for payment each month must be broken down by each store, showing the charges per store including the sales tax by the state in which each store resides. It is the responsibility of the Cleaning Contractor to collect the appropriate sales tax per individual state.

I have read and understand all 7 pages of the bid and reviewed the attachments listed on the last page. Please except our bid for the AC Moore National Cleaning Contract. We will be prepared to start at all AC Moore locations on September 1, 2004. We will establish a meeting with each store manager to review all the processes and answer any questions.

**Neu Solutions, LLC**
69 Montogmery Street
Pawtucket, RI 02860
Attn: Richard Miguel
800-286-9016

[signature] July 22, 2004
signature & date
Neu Solutions Representative

COPY OF ORIGINAL

08/24/2004

AC MOORE

Tuesday, July 13, 2004

## AC Moore CLEANING SERVICE CRITERIA.

***All Services should be based on an average store size of 21,000 Sq. Ft.***
**Attached is a basic store plan for reference.**

## DAILY SERVICE

The daily service is performed in the stores 5 days per week. The particular days on which service is completed varies from store to store depending on the stores' scheduled warehouse days and other considerations.

The basic daily program includes the following services:

1) The dust mopping of the entire sales floor area, offices, break-room and classroom. All gum, stickers, candy etc. will be scrapped and removed from the floors.
2) The rinsing and the ultra-high speed burnishing of the entire race track area and the entire front of the store. An optically enhanced floor cleaner that leaves no residue will be used as the rinsing agent.
3) The rinsing and ultra high speed burnishing of 1/4 of the remaining store area.
4) The spot mopping of spills in all other areas of the store.
5) *Complete* rest room cleaning, which includes the washing and disinfecting of all rest room fixtures, partitions and floors. All walls and partitions will be spot cleaned. A complete top to bottom cleaning and disinfecting of all rest rooms will be completed twice a year. Cleaning supplies by contractor.
6) Restroom supplies will be replenished each day and all restroom waste receptacles will be emptied. Restroom supplies will be furnished by A C Moore.
7) The vacuuming of all walk-off mats and entrance lobby carpeting.
8) The cleaning of the entrance door glass.
9) The Cleaning service will supply a brand new, top quality, ultra high-speed propane-burnishing machine at the start of services for each store. The equipment will be maintained in good working order or replaced if necessary.
10) All chemicals, buckets, wringers, wet mop heads, wet mop handles and sundry supplies and equipment, needed to complete the above services, will be provided by the Cleaning Service.

PRICE QUOTE PER MONTH. = $ 1,175.00

One thousand one hundred seventy-five dollars

**COPY OF ORIGINAL**

## SCRUB SERVICE

**08/24/2004**

A scrub service is completed in one night. The areas to be completed are prepared for refinishing by a combination of auto-scrubbing, heavy duty wet mopping and if necessary some deep scrubbing in selected areas (e.g. front entrance, check-out lanes, receiving aisles etc.).
A scrub service is utilized for the purpose of revitalizing the appearance of the floors by removing all top soil and applying additional coats of finish to a clean floor surface. It is essential that the floor surfaces be relatively clean with no heavy soil entrapment or deep damage to the existing floor finish.

***SCRUBBING PROCEDURES***
It is not recommended nor is it desirable for tables and counters to be moved during a scrub service. Temporary displays and stacks should be removed from the sales floor so that these areas can be refinished, but time limitations and the very nature of a scrub service preclude moving tables. The floor surfaces will be scrubbed and prepared for refinishing as stated above to remove top soil and a minimum amount of old floor finish. Two coats of ultra high-speed floor finish will then be applied to the remaining floor finish.

PRICE QUOTE PER SINGLE SERVICE. = $ 525.00

Five hundred twenty-five dollars

**COPY OF ORIGINAL**

**08/24/2004**

## STRIP SERVICE

A strip service is completed on three consecutive nights. A strip is recommended for completion once per year for the purpose of re-establishing a good base on which to build your daily floor care program. Our procedures demand a clean strip and rinse, which leave the floors surfaces with a neutral PH rating. This is most advantageous for having a successful refinishing process.

***STRIPPING PROCEDURE – 1st NIGHT***

*At* least 50% of the sales floor area will be stripped to bare floor. Two coats of semi-permanent seal are next applied to the floor. Use seals that are specially formulated to protect resilient tile floors from chemical stains such as blacktop coatings, oils, paints and solvents. After the seal dries thoroughly, two coats of floor finish constructed to withstand the rigors of ultra high speed burnishing will be applied to the sealed surfaces. Prior to the stripping process, A C Moore store personnel are to remove all tables, displays, stacks, power panels and portable end caps from the area being stripped.

***STRIPPING PROCEDURE – 2nd NIGHT***

The remainder of the sales floor area will be stripped in the same manner as the first half with the same procedures in effect..

***STRIPPING PROCEDURE – 3rd NIGHT***

All the support areas, such as offices, break-room, classroom and cash office (if accessible) will be stripped, sealed and refinished.

Three additional and final coats of the ultra high-speed floor finish will be applied to the sales floor area with all tables, displays etc. remaining in place. This will be accomplished after the sales floor has been prepped to remove the previous days soil from the floor surfaces.

PRICE QUOTE PER SINGLE SERVICE. = $ 2310.00

Two thousand three hundred ten dollars

The Daily cleaning service is an ongoing process; the other services listed (Strip and Scrub) are budgeted at one Strip and 2 Scrubs per year. The Store Manager and Regional Vice President of each location will determine when to perform the Strips and Scrubs for their stores. The regional vice president from each region must approve the Strip & Scrubs services if a store is over its allotted amount. Should there be a request for additional services not included in the above scenarios or over planned budget, then the cleaning contractor must produce a change order outlining the services provided and cost quote. This change order must be signed by the store manager and a copy submitted to corporate as part of the invoice procedure. If a change order is not signed, it will not be paid. Along with the monthly invoice should be a log report of services provided for that month by store location, all log reports must be signed off by the store management.

**COPY OF ORIGINAL**

**08/24/2004**

AC Moore invites the following companies to participate in the bid for the cleaning maintenance contract for all the AC Moore store locations in the United States. This contract will be for a little over one year from the award date.

**Blue Chip Services, LTD**
501 Silverside Road, Suite 90
Wilmington, DE 19809
Attn: Joe Lombardi
800-894-7823

**Horizon National Contract Services**
151 Bodman Place, Suite 400
Red Bank, NJ 07701
Attn: Jennifer Davis
315-426-8906
jdavis@horizon-ns.com

**KellerMeyer Building Services, LLC**
1575 Henthorne Drive
Maumee, OH 43537
Attn: Mike Silliman
800-537-1376 ext 423

**Preferred Building Services, Inc.**
722 Kearny Ave.
Kearny, NJ 07032
Attn: Russell Swanicke
800-644-1770 ext 24
russs@preferredbuildingservices.com

**Stitle Realty Services Corp.**
87 North Raymond Ave. Suite 550
Pasadena, CA 91103
Attn: Jana Greene
215-848-3145
janag@stitlerealty.com

**US Maintenance**
1880 Markley Street
Norristown, PA 19401
Attn: Vince De Paul
800-355-4000 ext. 564
vdepaul@usmaintenance.com

**On Target Maintenance**
120 Route 9W North
Haverstraw, NY 10927
Attn: Michael Pappas
800-720-0131
mpappas@on-target.com

**Neu Solutions, LLC**
3101 Shippers Road
Vestal, NY 13851
Attn: Richard Miguel
800-286-9016
rmiguel@neu-solutions.com

The Bid must be returned by 12 noon on Friday, July 23, 2004. No e-mail or faxed bid proposals will be accepted, only paper copies will be considered. Any deviation from the attached bid form will not be considered and submission of anything else will result in disqualification.

AC Moore wants a single unit price for each service listed so that the only variable in the invoices will be added extra services and sales tax. It will be the responsibility of the bidders to determine their costs and profit margins per location and then average a single price per service listed so that all stores are priced the same. Should this bid not produce the anticipated savings that are expected we reserve the right to continue with our existing service and not make an award.

**COPY OF ORIGINAL**

**08/24/2004**

**ATTACHMENTS:**

Along with the above written specifications will be:

1. **A store floor plan**, the stores are all very similar in layout and number of rooms. The average square footage per store is 21,000 Sq. Ft.
2. **A list of all current store locations** throughout the United States.
3. **A sample of a certificate of compliance.** It will be required as part of the bid to submit a similar document.

**AC MOORE Corporate Representative:**

Any questions regarding this bid should be directed to Jim Mitchell – Director of Store Planning. Jim Mitchell will be the responsible party for awarding the bid, ensuring that all requirements are met and upheld. He will rely on input from the Regional Vice Presidents and the store managers in order to track the progress of the winning Cleaning Contractor.

Jim Mitchell, ISP
Director of Store Planning
500 University Court
Blackwood, NJ 08012
856-228-6700 ext 175
jimm@acmoore.com

**COPY OF ORIGINAL**

**08/24/2004**

A.C. MOORE

***Floor Care Grand Opening Specifications***

**All the Services listed below encompass the entire sales floor, lounge, hallways, classrooms, restrooms and any offices that are accessible.**

Sales Floor

**Before Fixtures**

**Strip Service:** This service consists of stripping floor of all floor finish and applying 4 to 5 coats of finish.

**One Week prior to Soft Opening**

**Scrub Service:** This service consists of scrubbing the floor and applying 1 to 2 coats of finish.

**Day before Soft Opening:**

**PM Buff Service**: This consists of auto scrubbing the sales floor and damp mopping all other areas. Burnishing all areas and a thorough cleaning of the restrooms, including floors, walls, fixtures and partitions.

**Price Quote per Grand Opening Service: $3200**,00

Three thousand two hundred dollars

# A.C. Moore Stores Address Listing

[illegible]

COPY OF ORIGINAL
08/24/2004
AC MOORE

**COPY OF ORIGINAL**

**CERTIFICATION OF COMPLIANCE** **08/24/2004**

I, the undersigned, do hereby certify on behalf of Neu Solutions that all employees and agents designated by Neu Solutions, now and in the future, to perform work at A.C. Moore Locations have provided Neu Solutions with proper documentation demonstrating that they are legally authorized to work in the United States. I also certify that Neu Solutions has not transferred or assigned any of its rights, obligations or performance under the Subcontractor Agreement to any other party. I attest that I have the authority to execute this certification on behalf of Neu Solutions.

Signed: [signature]

Print Name: Richard J. Mignault

Title: President

STATE OF )
)SS:
COUNTY OF )

The foregoing instrument was acknowledged before me this 20th day of November, 2003, by Richard J. Mignault, who is personally known to me or who has produced a driver's license as identification and who did (did not) take an oath.

Print or Stamp Name:
Notary Public, State of at Large
Commission No.:
My Commission Expires:

*(For Spanish see reverse)*

# ACORD CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YY) 06/23/04

COPY OF ORIGINAL

**PRODUCER**
GENCORP INSURANCE GROUP
16 MAIN STREET
EAST GREENWICH RI 02818

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**COMPANIES AFFORDING COVERAGE**
COMPANY A THE HARTFORD
COMPANY B
COMPANY C
COMPANY D

**INSURED**
RJM HOLDINGS LLC & NEU
SOLUTIONS FACILITIES SERVICES
69 MONTGOMERY STREET
PAWTUCKET RI 02860

**COVERAGES**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY | 02SBATC4580 | 4/16/04 | 4/16/05 | GENERAL AGGREGATE | $2,000,000 |
| | X COMMERCIAL GENERAL LIABILITY | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | CLAIMS MADE X OCCUR | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | OWNER'S & CONTRACTOR'S PROT | | | | EACH OCCURRENCE | $1,000,000 |
| | | | | | FIRE DAMAGE (Any one fire) | $ 300,000 |
| | | | | | MED EXP (Any one person) | $ 10,000 |
| A | AUTOMOBILE LIABILITY | 02UECUE2921 | 4/16/04 | 4/16/05 | COMBINED SINGLE LIMIT | $ 500,000 |
| | X ANY AUTO | | | | | |
| | ALL OWNED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | SCHEDULED AUTOS | | | | | |
| | X HIRED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | X NON-OWNED AUTOS | | | | | |
| | | | | | PROPERTY DAMAGE | $ |
| | GARAGE LIABILITY | | | | AUTO ONLY - EA ACCIDENT | $ |
| | ANY AUTO | | | | OTHER THAN AUTO ONLY: | |
| | | | | | EACH ACCIDENT | $ |
| | | | | | AGGREGATE | $ |
| | EXCESS LIABILITY | 02SBATC4580 | 04/16/04 | 04/16/05 | EACH OCCURRENCE | $5,000,000 |
| | X UMBRELLA FORM | | | | AGGREGATE | $5,000,000 |
| | OTHER THAN UMBRELLA FORM | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | **SEE ATTACHED* | | | WC STATUTORY LIMITS / OTHER | |
| | THE PROPRIETOR/ PARTNERS/EXECUTIVE OFFICERS ARE: INCL / EXCL | | | | EL EACH ACCIDENT | $ |
| | | | | | EL DISEASE-POLICY LIMIT | $ |
| | | | | | EL DISEASE-EA EMPLOYEE | $ |
| | OTHER | | | | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS
AS PER COMPANY FORMS

**CERTIFICATE HOLDER**

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL 10 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES.

AUTHORIZED REPRESENTATIVE
Richard Padula, CIC AL A

 © ACORD CORPORATION 1988

**COPY OF ORIGINAL**
**08/24/2004**

The Beacon
Mutual Insurance Co.

One Beacon Centre
Warwick, Rhode Island 02886-1378
(401) 825-2667 Fax 825-2855

Certificate of Workers' Compensation & Employers' Liability Insurance

| CERTIFICATE HOLDER | INSURED |
|---|---|
| | **Neu Solutions Facilities**<br>**69 Montgomery Street**<br>**Pawtucket, RI 02860-2019** |

This certificate is issued as a matter of information only and confers no rights on the certificate holder. This certificate does not amend, extend, or alter the coverage afforded by the policy below.

COVERAGES

This is to certify that policy of insurance listed below have been issued to the insured named above for the policy period indicated. Notwithstanding any requirement, term or condition of any contract or other document with respect to which this certificate may be issued or may pertain, the insurance afforded by the policies described herein is subject to all the terms, exclusions, and conditions of such policies.

| TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE | POLICY EXPIRATION DATE | LIMITS OF LIABILITY |
|---|---|---|---|---|
| Workers' Compensation and Employers' Liability | 0000033542 | 04-16-2004 | 04-16-2005 | Statutory benefits Required by the Rhode Island Workers Compensation Law (X)<br><br>$500,000 Each Accident<br>$500,000 Policy Limit by disease<br>$500,000 Each Employee by disease |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS

CANCELLATION

Should the above policy be canceled before expiration date thereof, The Beacon Mutual Insurance Company will mail **10** days written notice to the certificate owner named herein by regular mail.

| Authorized Representative | Date Issued: 06/23/2004 |
|---|---|
| Broker of Record | Successfully Submitted |
| **Gencorp Insurance Group Inc.**<br>**16 Main Street**<br>**East Greenwich, RI 02818-3827** | |

③

COPY

# SUBCONTRACTOR AGREEMENT

SEPT 3, 2004 g.t.

This subcontractor agreement ("agreement") dated ~~August 12, 2004~~ is made between NEU Solutions, LLC and the person or company described on the signature page of this agreement ("subcontractor"). The following statements are the facts giving rise to this agreement:

(I) NEU is in the business of maintaining and cleaning commercial building spaces, and has contracted with various customers ("customers") for the provision of first quality maintenance and cleaning services in various facilities.

(II) Subcontractor is also in the business of maintaining and cleaning various facilities and wishes to provide such first class quality services to NEU to fulfill its obligations under its contract with its customers.

(III) NEU and Subcontractor agree that subcontractor will provide such services to NEU solely on the terms and conditions set forth in this agreement.

**Therefore,** in consideration of the promises and the agreements of the parties contained in this agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Recitals** – The above statements of the facts giving rise to this Agreement are incorporated in this Agreement as substantive provisions as though they were set forth in the numbered paragraphs below.
2. **Effective Date** – This Agreement will be effective when it is signed by **Both** NEU and the subcontractor ("Effective Date").
3. **Scope of Work** – Subcontractor agrees to perform the facility maintenance and cleaning service generally described NEU in the service specification addendum generally in the form attached to this Agreement as **exhibit 1**. Subcontractor agrees not to render services to NEU, or for, or on behalf of any Customer unless the same as described in writing in a service specification addendum, and NEU shall not be liable to pay the Subcontractor for any services that are not so described in writing. All services shall be performed in a first class, professional, prompt, safe, good and workman while manner and Subcontractor shall provide regular and continuous inspection and supervision of services being performed at the Customer locations. In the event of any conflict between the direction given to the Subcontractor by Customer and NEU regarding any provision of this Agreement or the performance of any service, NEU's direction shall prevail, and the Subcontractor shall follow NEU's direction. If Subcontractor renders services to NEU which are described in NEU's written direction to Subcontractor, then Subcontractor shall be deemed to have agreed to the scope of work set forth in **exhibit 1.**

97

4. **Labor, Equipment, Materials, Supplies, and Costs** – Except as otherwise specifically provided in this Agreement, Subcontractor agrees to furnish at its expense all (I) supervision and labor, (II) equipment and tools, (III) chemicals and supplies required for the performance of this Agreement, and (IV) all fees, fines, licenses, taxes (including specifically any sales taxes imposed upon Subcontractor's services or supplies purchased or sold by Subcontractor), and permits required for the performance of services. Subcontractor shall be solely responsible for determining methods, details, and means of performing services under this Agreement. If Subcontractor should ever use personal property belonging to NEU or a Customer, Subcontractor shall preserve, protect, maintain, and repair such property, and return it to its owner in the same condition as when received, normal and reasonable wear and tear expected. Should such property be damaged or lost in any way as a result of Subcontractor's negligence or abuse, the cost of the repair or replacement shall be borne solely by the Subcontractor. Attached as **Exhibit 2** are NEU's **minimum** requirements for regular maintenance of automatic floor scrubbers, and propane buffers, and the Subcontractor agrees to strictly comply with these requirements.

5. **Location and Hours** – Services shall be performed by the Subcontractor only at the locations specified in a service specification addendum (**Exhibit 1**) given by NEU to the Subcontractor. Subcontractor agrees not to render services to NEU or for or on behalf of any Customer unless the same are listed in **Exhibit 1**, and NEU shall not be liable to pay the Subcontractor for any services which are not listed in **Exhibit 1**. Services will be performed on the days and during the hours specified by the Customer at each of the various locations, to the extent commercially reasonably possible to accommodate the Customer, but subject to NEU's ultimate approval and control. If, for any reason, Subcontractor cannot provide services during the hours specified by the Customer, at least four (4) hours prior to that day's start time, Subcontractor shall take all reasonable steps to so notify NEU in writing, and by all reasonably available electronic means including but not limited to telephone, facsimile, pager and electronic mail.

6. **Cleaning Materials** – Subcontractor agrees to use only first quality cleaning materials, chemicals, and floor care products. In the event that either NEU or the Customer designates a specific brand or type of material, chemical, or product for such for such application or location until notified to do otherwise by NEU or the Customer. Material Safety Data Sheets must be used and kept on file in the Subcontractor's offices and at each Customer location for all such materials, chemicals, or products in accordance with all applicable federal, state, and local laws and regulations.

7. **Subcontractor's Independent Contractor Status** – The Subcontractor will be fully responsible for and will perform all services under this Agreement as an independent contractor only, not as an employee of, or joint venturer or co-venturer with NEU. Subcontractor has no authority to represent, speak for, or bind NEU.

8. **Safety** – Subcontractor shall take all reasonable safety precautions in performing services hereunder, and shall strictly comply with all safety measures, policies, and procedures of NEU and any Customer, and with all OSHA and state equivalent safety laws, regulations, rules, orders and ordinances.

9. **Compensation** – Subcontractor shall be paid for all services actually rendered and completed in accordance with this Agreement at the rates set forth in the applicable Subcontractor Payment Letter (**Exhibit 1**). If Subcontractor renders services to NEU, then Subcontractor shall be deemed to have accepted and agreed to the Subcontractor Payment Letter.

10. **Payment**

**a.** Upon Subcontractor's satisfactory completion of all services required by this Agreement, Subcontractor shall:

I. If required by NEU, for all regular recurring janitorial services, submit to NEU the Subcontractor's written invoice and (a) a Service Ticket substantially in the form attached to this Agreement as **Exhibit 3** or (b) any other similar form which may be required by NEU or its Customer. The Service Ticket (or functional equivalent required by NEU or Customer) must be completed, dated and signed by the Customer.

II. For all special, nonrecurring janitorial services, submit to NEU a written invoice and (a) an Overnight Production Service Ticket substantially in the form attached to this Agreement as **Exhibit 4** or (b) any similar form which may be required by NEU or its Customer. The Overnight Production Service Ticket (or functionally equivalent required by NEU or Customer) must be completed, dated, and signed by Customer.

**b.** NEU shall promptly pay the Subcontractor after receipt, review and where necessary in NEU's sole discretion, verification of the signed Service Ticket or Overnight Production Ticket and the Subcontractors invoice. NEU shall pay the Subcontractor twice per month. Please see **Exhibit 8** regarding specific pay date cycle.

**c.** NEU standard terms are Net 30 from date of receipt of the invoice. (No more than two invoices per month per location serviced). Any deviations from the standard terms will be listed on the Exhibit 8 or in an Authorization letter from NEU.

**d.** All state service taxes are the responsibility of NEU to remit to the appropriate agency per state law.

11. **Deductions from Payments-** Subcontractor agrees that all expenses incurred, credit extended, or payments made by NEU on behalf of Subcontractor in accordance with this Agreement, including, but not limited to, advanced service payments, equipment or supplies costs, insurance premiums, surcharges and penalties incurred for whatever reason, repair or replacement costs, lease payments and product purchases, may be deducted and set off by NEU against any payment earned by Subcontractor and due from NEU under this Agreement. In addition, NEU reserves the right, in NEU's sole and absolute discretion, to escrow payments due to Subcontractor in order to ensure that Subcontractors employees, subcontractors, or suppliers are fully paid for their services or products.

12. **Insurance-** On the Effective Date and at all times while this Agreement is in force, at Subcontractor's expense, Subcontractor shall have and maintain in force adequate insurance coverage as described herein. In the event that Subcontractor is in breach of this provision, or any portion hereof, for any reason at any time, NEU reserves the right to obtain such coverage for Subcontractor and deduct 110% of the cost thereof from payments due to the Subcontractor as provided in paragraph 11. Subcontractor shall at all times also provide to NEU current written evidence of such insurance coverage in the form of certificates of insurance setting forth the information provided in the attached **Exhibit 5** and providing that such coverage will not be cancelled, materially modified, or allowed to lapse without at least thirty (30) days written notice to NEU. Adequate insurance coverage shall mean:

a. **General Liability:** Commercial General Liability or Comprehensive General Liability insurance, on an "occurrence" form, having a combined single limit coverage of not less than (I) $500,000 per

97

occurrence with $1,000,000 umbrella coverage or (II) $1,000,000 per occurrence, or more as may be required by any Customer, and endorsed to include contractual liability, personal injury, completed operations, and broad form property damage liability, insuring Subcontractor against liability arising out of the business operations of Subcontractor and the service to be performed under this Agreement. Subcontractor agrees that should aggregate limits of liability be reduced due to loss or claims, such aggregate limits will be restored to the minimum state in this provision. The coverage, provisions, and limitations of this policy will not limit the liability of the Subcontractor. If, in the reasonable opinion of NEU, the amount of liability coverage required is not adequate, or any Customer requirements raise such limits, Subcontractor will increase said insurance limit as required by Customer or NEU and provide evidence of such increased coverage to NEU. Such coverage will be and state that it is primary and non-contributory and NEU will incur no liability, and shall be endorsed to name NEU and the Customer as additional insureds thereunder.

b. **Automobile Liability:** Combined single limit of not less than (I) $500,000.00 per occurrence with $1,000,000 umbrella coverage or (II) $1,000,000 per occurrence, which will include owned, non-owned, and hired motor vehicles and will insure against death or injury to persons and property damage caused by Subcontractor in the course and scope of providing services. Such coverage will be and state that it is primary and non-contributory and that NEU will incur no liability, and shall be endorsed to name NEU and the Customer as additional insureds thereunder.

c. **Workers Compensation:** Workers Compensation insurance with limits as required by statute, and Employers Liability insurance in an amount of not less than (I) $500,000 per occurrence primary limit with $1,000,000 umbrella coverage or (II) $1,000,000 per occurrence primary limits, or if greater, as required by applicable laws for each state in which Subcontractor will be engaged in any work under this Agreement. Subcontractor agrees to obtain such coverage for every employee servicing the Customer, even if such coverage is not required by law. The policy shall be endorsed to include a waiver of the subrogation in favor of NEU and the Customer.

d. **Blanket Crime or Fidelity Bond:** Blanket Crime or Third Party Fidelity Bond against liability for theft from Customers or NEU in the amount of at least $10,000 for any one theft, and Subcontractor hereby irrevocably (during the term of this Agreement) assigns any payment or reimbursement under such bond to NEU or any theft which results in liability to NEU.

e. **Property and Equipment:** All property and equipment of the Subcontractor shall at all times be fully insured against theft, loss, damage, or destruction for it's full replacement value.

13. **Injuries; Damage; Loss:** Subcontractor will immediately (and in any event within twenty-four (24) hours) notify NEU of all injuries to persons and damage to property in any way arising out of, or in the course and scope of performance of services under this Agreement, and no settlement or payment of any claim as to which NEU may be

charged with any obligation for any payment as reimbursement shall be made by the Subcontractor without NEU's prior written approval.

14. **Termination:**

a. This Agreement (or the Subcontractors right and obligation to perform services at the location of any Customer) may be terminated by Subcontractor upon thirty (30) days prior written notice to NEU, during which period, unless excused by NEU, the Subcontractor shall continue to render services under this Agreement.

b. NEU may terminate this Agreement (or the Subcontractors right and obligation to perform services at the location of any Customer) immediately if any of the following occurs:

(I) Subcontractor fails to perform services as set forth in this Agreement;

(II) Subcontractor violates any provision of this Agreement.

(III) Subcontractor fails to provide evidence of required insurance coverage, or Subcontractor's insurance is materially amended to reduce coverage or policy limits, or is cancelled and not immediately reinstated;

(IV) The death, disability, bankruptcy, liquidation, or dissolution of the Subcontractor; the assignment of all or a substantial part of the Subcontractor's business assets to or for the benefit of creditors; or the inability of Subcontractor to perform services as required;

(V) Subcontractor attempts to assign it's rights or obligations under this Agreement in violation of this Agreement;

(VI) With respect to any Customer location, NEU's Customer cancels NEU's contract for such location.

c. This Agreement (or the Subcontractor's right and obligation to perform services at the location of any Customer) may be terminated by NEU upon thirty (30) days prior written notice to Subcontractor, during which period, unless excused by NEU; the Subcontractor shall continue to render services under this Agreement.

d. Any termination by NEU may, at NEU's option, relate to this entire Agreement or to one or more Customer locations.

e. In the event of termination, NEU shall pay the Subcontractor on all invoices properly submitted and approved at the time, in the manner and in accordance with the terms of this Agreement, and shall give the Subcontractor a written notice substantially in the form attached as Exhibit 6.

15. **Subcontractor Consents:** If requested by NEU, Subcontractor agrees to immediately furnish NEU a signed statement from Subcontractor and each employee or agent of the Subcontractor who will perform services under this Agreement stating that (I) NEU may obtain a copy of and review said Subcontractor's, or employee's, or agent's police record, and (II) said Subcontractor, employee, or agent consents in advance to a reasonable search of his person and property when leaving a Customer's premises.

16. **Governing Law:** It is agreed that the validity, performance, interpretation, and effect of this Agreement will be governed by the laws of the State of New York, exclusive of its conflicts of law provisions.

17. **Restitution:** Subcontractor agrees, in proven cases, subsequent to conviction of theft, to make full restitution to NEU and it's Customers at full retail replacement price, on behalf of the Subcontractor, his employees, or agents.

18. **Hold Harmless and Indemnification:** Subcontractor agrees to indemnify NEU and its Customers against, and hold them and each of them harmless for all claims, suits, proceedings, damages, judgments, and settlements (including any reasonable attorneys fees) of any nature for any property damages, or loss, theft, bodily injuries, and death caused by any act of omission or negligence of the Subcontractor, its Agents, or employees, and to defend at Subcontractor's expense such claims, suits, and proceedings, including payment of the court costs, attorneys fees, and all other expenses arising out of the performance of this Agreement.

19. **Subcontractor's Employment Practices:**

a. Subcontractor shall pay when due and be fully and solely responsible for all taxes and costs related to the performance of services under this Agreement, all payroll costs, including but not limited to federal, state, and local income tax withholding, federal and state unemployment taxes, Social Security and Medicare taxes, workers compensation premiums or taxes, health insurance premiums, union dues and benefit payments, and other employee benefits. Subcontractor agrees and acknowledges that NEU will only comply with such information reporting on payments to Subcontractor as may be required by law, and Subcontractor shall comply with all withholding and information reporting requirements with respect to its employees and contractors, including specifically, but not limited to, Form I-9 and similar requirements.

b. Subcontractor shall also strictly comply with all federal, state, and local employment laws and regulations including, but not limited to, those relating to proof of citizenship or legal work status of its employees, wage and hour laws, and employment discrimination and sexual harassment laws, and to keep and maintain all records required for such compliance, and to afford NEU access to such records at any reasonable time. Upon request of NEU, Subcontractor shall provide NEU with such documentation, as NEU deems necessary to establish that the Subcontractor has complied with the foregoing requirements.

20. **Confidentiality; Covenant Not to Compete:**

a. Subcontractor acknowledges and understands that certain confidential and proprietary business or trade secrets of NEU may become known to Subcontractor only as a result of this Agreement and Subcontractor's performance of services, all of which business information is of great value to NEU, and the unauthorized use or disclosure of which will cause irreparable harm to NEU. Therefore, Subcontractor agrees and covenants, because of the Subcontractor's access to and knowledge of NEU's confidential Customers and account lists, its techniques, systems, methods, technical information, and other information of a confidential nature, never to reveal to others or to use itself, except as may be expressly authorized to perform this Agreement, any such confidential or proprietary business information of NEU, and Subcontractor undertakes for itself and all those acting on its behalf to keep and maintain such

information in strict confidence both during the term of the Agreement and after its expiration or termination.

b. Subcontractor agrees and covenants, because of Subcontractor's access to and knowledge of NEU's Customer(s) and accounts, (acquired solely as a result of this Agreement), and other confidential business information related thereto, that during the effective term of this Agreement, and for twenty-four (24) months after its termination and the termination of every other contract that the Subcontractor will have executed with NEU, whichever termination date shall last occur, Subcontractor shall not, either directly or indirectly, in any individual, representative, or participatory capacity, whether as an owner, stockholder, member, partner, joint venturer, employer, employee, director, agent, or in any other capacity, (I) solicit, provide service to, or interfere in any way with any Customer account then being serviced by NEU or which was a Customer account at any time during the term of this Agreement, or (II) solicit for employment or advise to leave the employment of NEU any person who is an employee of NEU at the time of the termination of this Agreement, or was so employed within one (1) year prior thereto. Further, Subcontractor agrees that if any Customer accounts served by Subcontractor are or were part of a multi-location business the covenants and undertakings made and given by Subcontractor under this paragraph will apply to all Customer locations in each and every district, area, or zone then serviced by NEU.

c. Subcontractor does hereby acknowledge that money alone would not adequately compensate NEU for the damage to its business as a result of the breach by Subcontractor of its agreement of confidentiality and non-competition, and the Subcontractor therefore agrees that in the event of any such breach, NEU, in addition to all other remedies available to it by law or in equity, will be entitled to injunctive relief for the enforcement thereof.

d. Subcontractor acknowledges and agrees that in order for NEU to be adequately protected under this paragraph, the provisions hereof must be applicable to all of its agents and subcontractors. Subcontractor agrees to incorporate the provisions of this Paragraph specifically or by reference in any contracts entered into with its agents or subcontractors in furtherance of its provision of services hereunder. In the event of Subcontractor's failure to do so, Subcontractor indemnifies and holds harmless NEU from and against any damage resulting from such failure.

21. <u>**Subcontractor's Taxpayer Identification Number:**</u> The Subcontractor shall inform NEU of its validly assigned, current federal taxpayer identification number at the time of signing this Agreement using IRS form W-9 attached hereto as **Exhibit 7.** Subcontractor agrees to immediately submit a new W-9 to NEU if its identification number or withholding status changes for any reason.

22. <u>**Assignability:**</u> This Agreement may be assigned in whole or in part at any time by NEU. This Agreement may not be assigned by Subcontractor without the prior written consent of NEU which may be granted or withheld in its sole and absolute discretion. Without limiting NEU's rights under this provision, the factoring of receivables by Subcontractor is expressly prohibited without prior written consent of NEU.

91

23. **Enforcement:** If any notice or other agreed upon time period of any provision hereof will be held by a court of competent jurisdiction to be inconsistent with a legally acceptable period then such stated time period will be deemed amended to bring it to conformity with the law and the provision will be valid and enforceable as amended.

24. **Entire Agreement:** This Agreement constitutes the entire agreement of the parties concerning the subject matter hereof. All other discussions, negotiations, correspondence, promises, and agreements, whether written or oral, are merged in, and extinguished by, this Agreement. This Agreement may not be amended except by a writing signed by both parties.

25. **Severability:** If any portion of this Agreement is held by a court of law to be unenforceable, the remaining provisions shall remain in full force and effect, and shall be construed to give the full meaning intended by the parties in this Agreement.

26. **Additional Provisions:** None, unless added here and initialed by all parties.

**In witness whereof,** NEU and Subcontractor have caused this agreement to be executed on the date set forth next to their signatures.

**NEU Solutions, LLC**

By: [signature]
(Authorized Officer)

Date: 8/12/04

Address: 69 Montgomery Street
Pawtucket, RI 02860

Telephone: (401) 725-[illegible]00
Facsimile: (401) 725-6[illegible]1

**Subcontractor:** Blue Chip

[signature]
(Signature of Authorized Officer)

Date: 8/16/04

P.O Box 1100
Address: 1308 Chester Pike
Sharon Hill, PA. 19079

Telephone: 610-534-4757
Facsimile: 610-534-0937

The following Exhibits attached to this agreement must be initialed or signed and returned:

**Exhibit 1:** Service specification addendum (3 pgs)
**Exhibit 2:** Propane Buffer maintenance instructions & minimum standards.
**Exhibit 3:** Automatic Floor Scrubber maintenance instructions & minimum standards –*N/A To this contract*
**Exhibit 4:** Overnight Production Service Ticket
**Exhibit 5:** Form of Certificate Insurance-Sample
**Exhibit 6:** Warning & Termination Communications (3 pgs)
**Exhibit 7:** IRS Form W-9
**Exhibit 8:** Payment Policy

A.C. MOORE

**Exhibit 1**
**Cleaning Specifications**

**Daily Services**

The daily service is performed in the stores 5 days per week. The particular days on which service is completed varies from store to store depending on the stores' scheduled warehouse days and other considerations.

The basic daily program includes the following services:

- The dust mopping of the entire sales floor area, offices, break-room and classroom. All gum, stickers, candy, etc. will be scrapped and removed from the floors.
- The rinsing and the ultra-high speed burnishing of the entire race track area and the entire front of the store. An optically enhanced floor cleaner that leaves no residue will be used as the rinsing agent.
- The rinsing and ultra high speed burnishing of ¼ of the remaining store area.
- The spot mopping of spills in all other areas of the store.
- *Complete* rest room cleaning, which includes the washing and disinfecting of all restroom fixtures, partitions, and floors. All walls and partitions will be spot cleaned. A complete top to bottom cleaning and disinfecting of all restrooms will be completed twice a year. Cleaning supplies by contractor.
- Restroom supplies will be replenished each day and all restroom waste receptacles will be emptied. Restroom supplies will be furnished by A.C. Moore.
- The vacuuming of all walk-off mats and entrance lobby carpeting.
- The cleaning service will supply a brand new, top quality, ultra-high speed propane burnishing machine at the start of services for each store. The equipment will be maintained in good working order or replaced if necessary.
- All chemicals, buckets, wringers, wet mop heads, wet mop handles, and sundry supplies and equipment, needed to complete the above services, will be provided by the cleaning service.

47

A.C. MOORE

**Scrub Service**

A scrub service is completed in one night. The areas to be completed are prepared for refinishing by a combination of auto-scrubbing, heavy duty wet mopping and if necessary some deep scrubbing in selected areas (e.g. front entrance , check-out lanes receiving aisles, etc.)

A scrub service is utilized for the purpose of revitalizing the appearance of the floors by removing all top soil and applying additional coats of finish to a clean floor surface. It is essential that the floor surfaces be relatively clean with no heavy soil entrapment or deep damage to the existing floor finish.

***Scrubbing Procedures***

It is not recommended nor is it desirable for tables and counters to be moved during a scrub service. Temporary displays and stacks should be removed from the sales floor so that these areas can be refinished, but time limitations and the very nature of a scrub service preclude moving tables. The floor surfaces will be scrubbed and prepared for refinishing as stated above to remove top soil and a minimum amount of old floor finish. Two coats of ultra high-speed floor finish will then be applied to the remaining floor finish.

97

A.C. MOORE

**Strip Service:**

**Stripping Procedure- 1st Night**
At least 50% of the sales floor area will be stripped to bare floor. Two coats of semi-permanent seal are next applied to the floor. Use seals that are specially formulated to protect resilient tile floors from chemical stains such as blacktop coatings, oils paints and solvents. After the seal dries thoroughly, two coats of floor finish constructed to withstand the rigors of ultra high speed burnishing will be applied to the sealed surfaces. Prior to the stripping process, AC Moore store personnel are to remove all tables, displays, stacks, power panels and portable end carts from the area being stripped.

**Stripping Procedure- 2nd Night**
The remainder of the sales floor area will be stripped in the same manner as the first half with the same procedures in effect.

**Stripping Procedure- 3rd Night**
All the support areas, such as offices, break-room, classroom and cash office (if accessible) will be stripped, sealed and refinish. Three additional and final coats of the ultra high –speed floor finish will be applied to the sales floor area with all tables, displays, etc. remaining in place. This will be accomplished after the sales floor has been prepped to remove the previous days soil from the floor surfaces.

97

# EXHIBIT 2

## Propane Burnisher Preventive Maintenance Program

The contractor and his/her employees assigned to service the store location will be using a propane burnisher provided by NEU Solutions, LLC. The contractor hereby acknowledges that he/she will maintain this equipment to the specifications as recorded below to assure the life of this equipment. Failure to do so will permit a back charge by NEU Solutions, LLC to the contractor far any preventive or repair maintenance that would be required to this equipment. In any case the contractor is responsible for any damage to the equipment resulting from abuse.

Propane tank must be stored in the cage at the rear of the building, or removed from the store daily. No propane tank can be left inside.

### Daily

1. Check oil level and maintain proper level (use 10W30 oil)
2. Clean recoil filter after each use (wash, squeeze and air dry. DO NOT WRING OUT)
3. Clean and remove all dust from machine
4. Clean and flip pad-center on machine. Replace when dirty or is reduced to 3/8" thickness.

### Weekly

1. Check run time and change oil and filters every 50 hours. Please note on Daily Checklist.
2. Inspect carburetor filter, both paper filter and pre-foam filter. (wash, squeeze and air dry. DO NOT WRING OUT) Replace paper filter when dirty.
3. Check for loose bolts, tighten if needed.
4. Check belt tension (pinch belt together, it should depress ½") Adjust if needed.

### Monthly

1. Perform all daily and weekly services.
2. Inspect spark plug and replace if necessary.
3. Change oil and filter every 50 hours.
4. Inspect fuel hoses for leaks. Repair/Replace as needed.
5. Wash all undercarriage of burnisher to remove all dust and debris.

### Semi-Annual

Perform all of the above services and have machine checked by, and serviced (tune up) by an authorized service center. This check will include an emission test with the documented results provided to NEU Solutions, LLC.

Signature [signature] Company Blue Chip Services
Printed Name Joseph T Lombardi Title Pres.
Date 8-16-04

# EXHIBIT 3 — N/A

## Automatic Scrubber Preventive Maintenance Program

The contractor and his/her employees assigned to service the store location will be using a automatic scrubber provided by NEU Solutions, LLC. The contractor hereby acknowledges that he/she will maintain this equipment to the specifications as recorded below to assure the life of this equipment. Failure to do so will permit a back charge by NEU Solutions, LLC to the contractor far any preventive or repair maintenance that would be required to this equipment. In any case the contractor is responsible for any damage to the equipment resulting from abuse.

### Daily

1. Empty and rinse out recovery tank.
2. Flush out vacuum hose.
3. Check battery water level. Fill as needed using only distilled water.
4. Remove squeegee assembly, rinse and clean. Replace on scrubber, or if left off store upside down on its frame. (do not store blade side down)
5. Replace used pads when dirty or reduced to 3/8" thickness.
6. Recharge batteries daily making sure to plug charger onto batteries.

### Weekly

1. Check for loose bolts. Tighten if needed.
2. Adjust squeegee assembly as necessary to provide water pickup.
3. Check squeegee blade for wear. Flip as needed.
4. Check solution tank filter. Clean as needed.

### Monthly

1. Perform all daily and weekly services
2. Lubricate all points using waterproof grease.

Signature______________________________ Company______________________________
Printed Name___________________________ Title________________________________
Date__________________________________

A.C. Moore Spec Overview

1. The first attached document behind these instructions is the Daily production Ticket for the AC Moore contract. These specs are to be followed on a daily basis per the Sub Contractor Agreement. **Please find the <u>Daily Production Ticket</u>. This ticket must be filled out and signed by a member of Store Management on a daily basis and faxed from each store location.** *Additional copies of the Daily Production Ticket can be found in the Corporate Cleaning Program Binder located in the Break room. The Daily ticket is a payment ticket.*

2. Scrub & Strip Services: Upon Authorization from Neu Solutions to perform a Specialty Service. These services must be signed off for each day these services are being performed until completion. ***(These completed tickets must accompany the extra invoices for services.)***

3. Overnight Tickets: This ticket is for any other account for work Authorized by Neu Solutions for the sub contractor. (***This ticket need to accompany the invoice for any service***).

A.C. MOORE

New

800-286-9016

## Strip, Scrub & Specialty Services Ticket

FAX: 401-725-6511

Store # ______________

Date: ________

Crew Arrival: __________ AM/PM Crew Departure: ________________ AM/PM

# of Crew Members: ________

| | | | |
|---|---|---|---|
| Scrub & Recoat | o Completed | o Partial | o Dissatisfied |
| Strip& Recoat | o Completed | o Partial | o Dissatisfied |
| Fixture Moves | o Completed | o Partial | o Dissatisfied |
| Windows | o Completed | o Partial | o Dissatisfied |
| Sidewalks | o Completed | o Partial | o Dissatisfied |
| Carpet Extraction | o Completed | o Partial | o Dissatisfied |
| Backroom | o Completed | o Partial | o Dissatisfied |
| Matting | o Completed | o Partial | o Dissatisfied |
| Other | o Completed | o Partial | o Dissatisfied |

Overall Satisfaction: 1 2 3

______________________________ ______________________________

Store Manager Name (Print) Contractor Name(Print)

______________________________ ______________________________

Store Manager Signature Contractor Signature

AC Moore Comments: ______________________________

______________________________

______________________________

Contractor Comments: ______________________________

______________________________

______________________________

1:Unacceptable 2: Good 3: Excellent

97

AC MOORE

New

# Daily Service Quality/Payment Ticket

800-286-9016

FAX: 401-725-6511

Store # ______________ Date: ______________

Crew Arrival: __________ AM/PM Crew Departure: ______________ AM/PM

# of Crew Members: ________

Service Type: o Daily

Restroom Sanitation: 1 2 3

Sales Floor:

| | | |
|---|---|---|
| Dust Mopping: 1 2 3 | | Offices: 1 2 3 |
| Damp Mopping: 1 2 3 | | Lounge: 1 2 3 |
| Buff/Burnish: 1 2 3 | | Backroom: 1 2 3 |

Overall Service Satisfaction: 1 2 3

______________________ ______________________

Store Manager Name (Print) Contractor Name (Print)

______________________ ______________________

Store Manager Signature Contractor Signature

AC Moore Comments: ______________________________

Contractor Comments: ______________________________

1:Unacceptable 2:Good 3: Excellent

97

Neu

## Overnight Production Ticket

Store # ____________ Location: ________________________ Date of Service: ____________

Arrival Time: ___________ Departure Time: ____________ Number of Employees: _________

Type of Service

- ☐ Daily
- ☐ Scrub
- ☐ Strip
- ☐ Carpet Extraction

Store Manager Signature of Approval: ________________________ Store Stamp: _________

*(Note: Manager Signature confirms service completed satisfactorily.)*

Rating:

- ☐ Unsatisfactory (1)
- ☐ Satisfactory (2)
- ☐ Good (3)

*(If you are not satisfied with this service, please contact your NEU Solutions representative, Or call 1-800-286-9016.)*

Contractor Signature: ___________________________________

---

Security - All cleaners are subject to search prior to leaving the premises. Store Management can, at their discretion, search or questions all cleaning personnel.

---

**Store Inspection:** **Store was inspected and reviewed by:**

**Store Management:** ________________________ **(print name)**

**Contractor:** ________________________ **(print name)**

**Store was opened by management at:** __________ **AM**

**Areas accomplished:**

- ☐ Sales Floor
- ☐ Windows
- ☐ Lobby
- ☐ Lounge
- ☐ Hallways
- ☐ Office Areas

---

**Manager's Comments:**

______________________________________________

______________________________________________

**Contractor's Comments:**

______________________________________________

______________________________________________

______________________________________________

**Neu**

***Exhibit 6***
***Termination and Warning Correspondence***

Date

Name
Co name
Address

Dear __________,

I am terminating our agreement for services at (customer name) effective (date). As we discussed if services deteriorate at any other locations I will be forced to remove those as well. Please insure that all requirements our meet per our agreement signed (date).

Sincerely,

Name
Area Manager/State
Via: Fax, email and certified mail

**Neu**

Date

Name
Co name
Address

Dear __________,

This letter is in response to our conversation today. I am not pleased with the sales floor gloss level and the overall work ethic of your employee at the (customer name and address). I expect the following addressed within the next week:

1. List items
2. list items

I will follow up with you on (list date) to re- inspect the store with you. Thank you in advance for immediate response.

Sincerely,

Name
Area Manager/State

Exhibit 7

Form **W-9**
(Rev. January 2003)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

**Give form to the requester. Do not send to the IRS.**

Print or type — See Specific Instructions on page 2.

Name: BLUE CHIP SUPPLY CO. INC

Business name, if different from above: BLUE CHIP ...ONW ITS LTD

Check appropriate box: ☐ Individual/Sole proprietor ☒ Corporation ☐ Partnership ☐ Other ▶ .................. ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.): 501 SILVERSIDE RD SUITE 90

Requester's name and address (optional)

City, state, and ZIP code: WILMINGTON, DE 19809

List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). **However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3.** For other entities, it is your employer identification number (EIN). If you do not have a number, see **How to get a TIN** on page 3.

Social security number: | | | – | | – | | | |

or

*Note: If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.*

Employer identification number: 51-0369658
51 0369658 97

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

**Sign Here** Signature of U.S. person ▶ [signature] Date ▶ 8-16-04

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

***Note:** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.*

**Foreign person.** If you are a foreign person, use the appropriate Form W-8 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

Neu

# EXHIBIT 8

## INVOICING:

All invoices should be sent to: NEU Solutions, LLC
69 Montgomery Street,
Pawtucket, RI 02860

## PAYMENT POLICY

## ACCOUNT

**Store# AC Moore # 9,14,20,62** ______________________
**Address:** ______________________
**City, State, Zip code:** ______________________
**Manager:** ______________________
Phone: ______________________

**Payables:**

| **Monthly Service** | **Scrub** | **Strip** |
|---|---|---|
| **$ 900.00** | **$400.00** | **$1500.00** |

**Service to be performed: Daily Service per spec** ______________________

______________________

______________________

**Terms: Net Fourteen (14) from receipt of the invoice.**

______________________
**Contractor Signature**

______________________
**Authorized NEU Signature**

**Name:** [illegible]

**Title:** Cust. Serv. Mgr.

Neu

## EXHIBIT 8

## INVOICING:

All invoices should be sent to: NEU Solutions, LLC
69 Montgomery Street,
Pawtucket, RI 02860

## PAYMENT POLICY

## ACCOUNT

**Store# AC Moore #[illegible],2,5,6,7,18,47** ______________
**Address:** ______________
**City, State, Zip code:** ______________
**Manager:** ______________
**Phone:** ______________

**Payables:**

| Monthly Service | Scrub | Strip |
|---|---|---|
| $ 900.00 | $400.00 | $1500.00 |

**Service to be performed: Daily Service per spec** ______________

______________

______________

**Terms: Net Fourteen (14) from receipt of the invoice.**

[signature] ______________
**Contractor Signature**

[signature] ______________
**Authorized NEU Signature**

**Name:** [illegible]

**Title:** [illegible]

# Quality Control Summary

| Period | Total # of AC Moore Locations | # of Locations Reporting | % of Stores Reporting | Average Period Rating |
|---|---|---|---|---|
| | | | | |
| October 10-1- 10-31-04 | 88 | 67 | 77% | 2.5 |
| | | | | |
| November 11-1- 11-30-04 | 90 | 66 | 74% | 2.38 |
| | | | | |
| December 12-1- 12-24-04 | 93 | 68 | 73.1% | 2.39 |
| | | | | |
| January 4, 2005 | 93 | 86 | 93.4% | 2.37 |
| | | | | |

5

A.C.MOORE

Wednesday, December 29, 2004

To: Neu Solutions Facilities Services, LLC
69 Montgomery Street
Pawtucket, RI 02860
800-286-9016
Attn: Richard Miguel – President

RE: **30-Day Notice of Cancellation of Corporate Cleaning Contract.**

This letter will serve as notice for the cancellation of the entire corporate cleaning contract for AC Moore, Inc. Management of AC Moore, Inc. is canceling this contract based on the terms of the contract agreement as stated:

**Non-performance**, the inability to provide cleaning personnel on a regular schedule. Continued Service interruption will not be tolerated and will lead to cancellation of this contract in part or the entire AC MOORE chain. AC MOORE also reserves the right to cancel the contract should there be on going performance and cleanliness issues as noted on the daily service tickets. 30-day notice will be given should the contract be cancelled.

Neu Solutions Facilities Services, LLC has not been able to maintain the performance standard required by the agreement. Interrupted service, poor training of sub-contractors, and cleanliness issues have been on going. January 29th, 2005 will be the last day of service. It is expected that Neu-Solutions will continue to maintain the stores for the 30-day period up to January 29th, 2005

Jim Mitchell
Director of Store Planning
AC Moore, Inc.

AC MOORE

Friday, October 29, 2004

AC Moore 2005 Distribution Warehouse Cleaning Agreement:

This agreement will be valid for the time starting November, 1, 2004 and ending on December 31, 2005.

1. **Cleaning Personnel:** The service provided will be performed by qualified personnel they must be trained in the use of all equipment used in the cleaning of an AC Moore Distribution Center, they must have a complete understanding of all chemicals and cleaning solvents that they may use in the cleaning of an AC Moore location and the correct storage of those solvents. No illegal aliens will be permitted to work; all cleaning personnel must have the legal documentation to work in the USA. Proof of this documentation must be made available when requested by a representative of AC Moore. Should the cleaning contractor unknowingly hire an illegal alien and it results in legal ramifications with any governmental agency, AC Moore will be held harmless. Neu Solutions Facilities Services, LLC and any contractors hired to perform cleaning services under the management of Neu Solutions Facilities Services, LLC shall behalf responsible.

2. **Insurance:** Neu Solutions Facilities Services, LLC must maintain valid insurance as part of the contract agreement. Shown in the following minimum amounts:

| | |
|---|---|
| A. Workers Compensation: | State Limits |
| B. Liability | $2,000,000 |
| C. Non-Owned Auto | $500,000 |
| D. Umbrella Coverage | $10,000,000 |
| E. Janitorial Bond | $500,000 |

3. **Performance:** It is imperative that the distribution centers look their best on a regular basis. Because of this AC Moore must receive quality cleaning services. When performing any of the listed services, clean mop heads, clean buffing & scrubbing heads, etc will be used. All services must be signed off to the satisfaction of the manager of each location in the distribution center. Should the manager not sign off, then the cleaning contractor will be required to remedy the issues to the managers' satisfaction at the cost of the cleaning contractor. In the cleaning contractor specifies a specific remedy for a cleaning issue and the store manager rejects the remedy it must be noted and signed on the cleaning contractors Cleaning Service Report (Attachment A). **Non performance** must be addressed by Neu Solutions within 48 hours of notification. Written notice must be given regarding continued performance issues and may be grounds for termination.

4. **Damage:** Any damage done by the assigned cleaning contractor to an AC Moore Store because of misuse or lack of training in the use of cleaning equipment and supplies will be charged back to Neu Solutions Facilities Services, LLC. The term "Damage": is not isolated to just the physical building but to the distribution center fixtures, equipment and merchandise.
5. **Theft:** Will not be tolerated by any cleaning personnel, cleaning personnel will be prosecuted to the full extent of the law if found to be stealing from AC Moore. All loses will be reimbursed by Neu Solutions Facilities Services, LLC. The security agreement (attachment B) must be signed and dated. A copy must be sent to Neu Solutions Facilities Services, LLC prior to starting any work in the assigned areas. Every time a new individual is added to the list and has signed it, it must be immediately faxed to Neu Solutions Facilities Services, LLC to have on file. Failure to do so will be grounds for terminating the contract.
6. **Payment and Record Keeping:** One invoice will be generated to encompass the Corporate location. Invoicing at the beginning of each month for daily service to be performed that month, should any service be missed it will be made up or a credit will be issued and be sent to AC Moore corporate offices. Terms will be net 30. Accompany the invoice will be any request for additional services (attachment C) and the daily service reports for all locations from the prior month in an electronic format. All reports and backup by location will be in excel format file and saved to a CD disk, the disk will be sent with the invoice each month. Neu Solutions Facilities Services, LLC will implement an Internet Accessible system for viewing daily service reports, requests for additional services, etc.

The invoice submitted for payment each month must be broken down by each location, showing the charges including the sales tax by the state in which each location resides. This is considered the backup mentioned above. It is the responsibility of the Neu Solutions Facilities Services, LLC to collect the appropriate sales tax per individual state.

Friday, October, 29, 2004

The following 10 pages, dated October 29, 2004 along with Attachments "A","B", "C" will be the final agreement between AC Moore Inc. and Neu Solutions Facilities Services, LLC. Attached for reference is a copy of the original bid. By signing below, both parties agree to the terms set forth in the above agreement, dated October 29, 2004.

For Clarification all references to "Cleaning Contractor" are employees, sub contractors or other persons working for and /or being managed by Neu Solutions Facilities Services, LLC.

Signature Date: 10/29/04

Richard J. Miguel – President

Neu Solutions Facilities Services, LLC.
69 Montgomery Street
Pawtucket, RI 02860
800-286-9016
rmiguel@neu-solutions.com

Signature Date: 12/30/04

[redacted] - Chief Engineer

AC Moore Inc.
130 AC Moore Drive
Berlin, NJ 08009
856-768-4930 X 379
richardk@acmoore.com

6

Neu Solutions
FACILITIES SERVICES, LLC

January 6, 2005

Mr. Jim Mitchell
Director of Store Planning
AC Moore, Inc.
130 AC Moore Drive
Berlin, NJ 08009

Dear Jim,

I have over the past four days attempted to discuss with you the position of Neu Solutions regarding your "30-Day Notice of Cancellation of Corporate Cleaning Contract "with you verbally and to arrange a meeting with "Management of AC Moore, Inc." mentioned in your letter. I have verbally disputed the incorrect contentions made in your letter dated December 29, 2004, since I received it on December 31, 2004. I have always expressed the desire of Neu Solutions to continue with our contract for the remaining 10 months through December 1, 2005 or agree to a mutually beneficial financial resolution by AC Moore, Inc to Neu Solutions. Neu Solutions is ready, willing and able to do so.

A meeting was scheduled for 1pm yesterday at AC Moore corporate offices. I met with you and Denise Neil. The "Management of AC Moore, Inc." was not in attendance. I brought up the following positions of Neu Solutions:

> *A.C. Moore's Breach of contract*; 1) the contract signed of August 25, 2004 for the term of 15 months contains as all contracts do a "covenant of good faith" for the parties to cooperate and not frustrate performance; and 2) the Non-Performance clause listed in your letter is a merely pretext for AC Moore corporate reasons not listed in the letter and to cover AC Moore's failure to act in good faith.
>
> *AC Moore's and Jim Mitchell's Interference with Neu Solutions sub-contractors*: 1) you had improper preliminary discussions with our current contractors weeks ago, 2) you entered or are negotiating contracts with our current contractors, 3) AC Moore is fully aware that we have signed sub-contract agreements with our contractors prohibiting their ability to do work directly or indirectly for AC Moore.
>
> *AC Moore must buy out Neu Solutions equipment and contract*; 1) Neu Solutions purchased $61,000 of equipment from Joe Lombardi (Blue Chip Services/Infinity Services et al.) at the behest of AC Moore, 2) Neu Solutions purchased additional new equipment for $125,000 from Minuteman International, miscellaneous equipment/supplies for store use for $16,200 and miscellaneous

69 Montgomery Street • Pawtucket, RI 02860
Phone: 800-286-9016 • Fax: 401-725-3258

equipment/supplies for contractor use $14,000, 3) web based software designed specifically for AC Moore to track quality $16,350, 4) that this total asset purchase of $232,550 was based on the term of 15 months as outlined in the contract.

The position stated during our meeting by you on behalf of AC Moore is that as to

1. Your Breach of contract. You stated that you believe the good faith actions of Neu Solutions are not valid and that AC Moore does not need to respond to its failure to act in good faith. This reaction is quite unfair and probably illegal.

2. Your Interference with Neu Solutions contract and sub-contractors. Amazingly you stated that my signed purchase, sale and sub-contract agreements between Neu Solutions and Blue Chip/Joe Lombardi "are between you and him".

I requested to negotiate on behalf of Neu Solutions with "Management of AC Moore, Inc" and you stated "management has no desire to discuss or negotiate your position". You also stated that "you can bill me the $12,000 for the supplies you bought for the stores and I will process it through". When I asked about processing the January 2005 invoice under the contract terms you stated "I am not paying that till after the month is over and I have had a chance to review it in detail".

You also told me to remove my equipment and supplies from your locations by the end of January. This is also unacceptable as it will cost me thousands of dollars to relocate and store this material bought expressly for AC Moore. There is presently no other location or use for this material. You are acting completely unreasonably and appear to intend to cause me to sell this material at an unconscionable financial loss.

The options stated by you on behalf of AC Moore are not acceptable to Neu Solutions. I remain optimistic that this can be resolved between Neu Solutions and AC Moore in a manner acceptable to both parties. My previous attempts have not prevailed. I look forward to your response or phone call tomorrow January 7, 2005 or Neu Solutions and I will have no other alternative than to seek immediate legal remedies. I await your anticipated response.

Sincerely,

Richard J. Miguel
President, Neu Solutions

Neu Solutions
FACILITIES SERVICES, LLC